416 F.Supp. 1252 (1976)
Raymond SCHULER, Commissioner, Department of Transportation of the State of New York, and New York Dock Railway Company, Plaintiffs,
v.
Thomas F. PATTON and Ralph S. Tyler, Jr., Trustees of the Property of Erie Lackawanna Railway Company, Defendants.
No. 76-3.
Special Court, Regional Rail Reorganization Act.
June 18, 1976.
*1253 Walter M. King, Jr., King & St. George, Washington, D. C., for New York Dock Railway Co.
Arthur L. Winn, Jr., LaRoe, Winn & Moerman, Washington, D. C., for Port Authority of New York.
Harry Shereff, New York City, for Brooklyn Eastern Dist. Terminal.
John C. McTiernan and Bernard Sack, Albany, N. Y., for New York Dept. of Transp.
John L. Altieri, Jr., Mudge, Rose, Guthrie & Alexander, New York City, for Trustees of Erie Lackawanna Railway Co.
Howard M. Wilchins, Washington, D. C., for U. S. Railway Ass'n.
Before FRIENDLY, Presiding Judge, and THOMSEN, Judge.
THOMSEN, Judge.
This action was instituted by the Commissioner of the Department of Transportation of the State of New York (DOT) and New York Dock Railway (NYDock) against the Trustees of the Property of Erie Lackawanna Railway Company (EL), appointed by the United States District Court for the Northern District of Ohio in the reorganization proceedings under Chapter VIII of the Bankruptcy Act. Plaintiffs seek preliminary and permanent injunctions under the Regional Rail Reorganization Act of 1973, as amended (the Act):
(1) Enjoining defendants from offering or transferring the rail marine properties, facilities and equipment in the Port of New York held by them as such trustees (the properties in question) to buyers other than plaintiffs or Brooklyn Eastern District Terminal (BEDT);
(2) Ordering defendants to transfer and convey the properties in question to DOT, NYDock or BEDT "at `incentive prices,' pursuant to the USRA Final System Plan, as authorized by Sections 209 and 303(c)(5) of the Act";
(3) Enforcing the order of the Interstate Commerce Commission (ICC), served March *1254 17, 1976, in Ex Parte 293 (Sub.-No. 10), and enjoining defendants, pending a further order of the Commission, from "refusing to comply with the provisions of Section 304(d)(3) of the Act"; and
(4) Staying defendants from further proceedings before the United States District Court for the Northern District of Ohio on their pending motion for leave to sell the properties in question.
BEDT and the Port Authority of New York and New Jersey have intervened as plaintiffs. United States Railway Association (USRA) has intervened as a defendant. New York Shipping Association, International Longshoremen's Association, AFL-CIO, New York Terminal Conference and its member companies have been allowed to intervene as amici curiae. The EL Trustees and USRA seek dismissal of the several claims on the ground that the complaint does not state a cause of action on which relief can be granted by this court. Evidence has been presented by both sides in the form of depositions and exhibits; briefs have been filed and considered, and oral argument has been heard.
Although the prayers for relief are broadly drawn, the immediate problem arises out of the fact that the EL trustees propose to sell promptly, for a total price of $477,000, two tug boats, one covered barge, two scows and five carfloats, formerly used to carry freight from EL's Hoboken Terminal or Jersey City Pier No. 1, but which were not designated for transfer to anyone in the Final System Plan (FSP). The EL trustees have stated to this court that they are willing to sell such floating equipment to plaintiffs or intervenors at a fair market price; specifically they are willing to sell the items listed in this paragraph for the highest bids they have received for those items.
Section 209(b) of the Act provides in pertinent part for the consolidation in this court of all judicial proceedings with respect to the FSP. This court is authorized to exercise the powers of a district judge in any judicial district with respect to such proceedings; such powers include those of a reorganization court.
Section 209(e)(1) provides that any civil action  "(C) challenging the legality of any action of USRA, any failure of USRA to take any action, pursuant to authority conferred or purportedly conferred under the Act" shall be within the original and exclusive jurisdiction of this court. It further provides: "Relief shall not be granted in any action referred to in subparagraph (A), (C), or (E) unless the person seeking such relief establishes that the Association acted in reckless or deliberate disregard of applicable law".
Section 206(a) of the Act states that FSP shall be formulated in such a way as to effectuate eight goals listed in that subsection (q. v.); § 206(b) sets out many of the factors relevant to the realization of those goals.
After long study, USRA submitted FSP to Congress on July 26, 1975. FSP contained a section (Vol. II, pp. 9-11) on the "Railroad Marine Operations," conducted by various railroads in reorganization, across Lake Michigan, Mackinac Straits, the Delaware River and the mouth of the Chesapeake Bay, as well as in New York Harbor. With respect to the "PC-LV-EL New York Harbor Operations," that section of FSP stated, inter alia: "The present carfloat services in the New York Metropolitan area are characterized by duplication, deteriorated facilities, old equipment and a resulting high operating cost." It noted that "[t]he Chessie system will not acquire EL float equipment or float bridges. It will honor existing tariffs applying to float traffic, but will do so using ConRail facilities at Greenville". It concluded that "[t]he volume of traffic, lack of suitable alternatives, efficiency improvement potential and, if necessary, increased revenues indicate that the car-float services by ConRail should not be abandoned. It must be recognized, however, that if the revenue cost relationships are not resolved, the traffic volume will continue to decline as rail carriers divert traffic to other ports." The Plan then made the following recommendations:

*1255 "While the carriers themselves, including the independent dock carriers (New York Railroad and Brooklyn Eastern District Terminal Railroad), have a major stake in improving the efficiency of carfloat operations, the public bodies (the Port Authorities of New York and New Jersey, the states of New York and New Jersey and the city of New York) have a major interest also. Substantial public funding has been used in the past in both New York and Newark to improve and modernize the handling of export/import traffic; other Eastern seaboard cities have provided similar public support for their marine terminals.
"USRA recommends that ConRail, Chessie, and the present independent dock carriers and the interested public bodies undertake a program which would seek to:
"consolidate facilities and services to eliminate present duplication (started with Chessie's action);
"undertake a modernization program to improve efficiency;
"investigate the possibilities of a single management control for the entire float operation; and
"explore the possibilities for a greater reliance on all-rail routes to New York, with special attention to the possibilities for use of the Poughkeepsie Bridge route once it is restored to service.
"Implementation Opportunities.  While USRA has not prepared studies to indicate the method of achieving these objectives, considerable field work in the harbor area indicates that the following specific opportunities should be explored.
"All car-float activity (all water-borne traffic to and from ConRail on the New Jersey side of the harbor) will be concentrated at Greenville, New Jersey (the present Penn Central facility). Rehabilitation of both the float bridges and supporting rail yard at this facility will be required. USRA recommends assumption of the capital cost of upgrading the Greenville facility by some public agency such as the Port Authorities of New York and New Jersey, and operation of the facility by an independent terminal carrier. All remaining float equipment in the area still owned by the railroads in reorganization should be made available for the rehabilitation. All floating equipment now owned by the line haul carriers would be made available to the terminal companies at incentive prices. It will be necessary for ConRail to sell sufficient switching locomotives to the terminal carrier for the operation of the Greenville support yard.
"USRA recommends that the two Brooklyn-based terminal companies integrate or closely coordinate their cross-harbor floating operations with ConRail for maximum efficiency. The inclusion of the entire Bay Ridge Branch (PC) in the FSP and the proposed new construction in the Bay Ridge area should have an eventual positive impact on the New York Dock Railway's floating operations.
"USRA believes that these improvements may lead to improved efficiency sufficient to restore profitability. If that is not achieved, it will be necessary for the carriers to seek rate increases necessary to make car-float operations compensatory. In this regard, the Association's recommendation is no different from those for any other existing deficit operations  efficiency must be improved but wherever that action alone will not restore viability, then necessary rate adjustments must be made to insure profitability and service continuation.
"Regarding lighterage services, USRA believes the base volumes are so low that there is little chance that the rail carriers can perform the services efficiently. USRA recommends that railroad-operated lighterage services be terminated and the necessary lighterage services be performed in the future by available commercial firms. These firms can better handle the remaining traffic volumes than can the rail carriers."
Plaintiffs rely heavily on two sentences in those recommendations: "All remaining float equipment in the area still owned by *1256 the railroads in reorganization should be made available for the rehabilitation. All floating equipment now owned by the line haul carriers would be made available to the terminal companies at incentive prices." Those sentences, however, must be read in context, which includes not only the discussion of the problem, quoted above, but, most importantly, the designations for transfer contained in FSP. Chapter 8 of FSP is the portion of the plan in which such designations were made by USRA. The only designation made with respect to floating equipment in New York Harbor was for transfer of an option to ConRail to purchase certain floating equipment owned by Penn Central. FSP did not designate, and USRA did not certify, any EL floating equipment or marine properties or facilities at Hoboken or at Pier One, Jersey City, or any interest therein, for transfer to anyone.
Hearings to review FSP were conducted in September 1975 by the House Committee on Interstate and Foreign Commerce. Among the witnesses was Stuart Johnson, one of the attorneys for NYDock. The Senate Committee on Commerce also conducted hearings to review FSP. Neither the Senate nor the House passed a resolution rejecting FSP, and under § 208(a) of the Act, this had the effect of approving the Plan.
An Official Errata Supplement which corrected errors and misapplication of designation and disposition principles in FSP was submitted to Congress by USRA on December 1, 1975. The EL floating equipment was not designated for conveyance therein. The Official Errata Supplement was explicitly adopted by Congress. See § 208(d)(1) of the Act, as amended by the Railroad Revitalization and Regulatory Reform Act of 1976, P.L. 94-210, February 5, 1976.
On February 25, 1976, pursuant to § 208(d)(3)(A) of the Act, as so amended, USRA published additional, corrected or clarifying designations in the Federal Register. Again, none of the EL floating equipment was designated for conveyance. None was conveyed by the conveyance order of this court.
On March 29, 1976, NYDock indicated to the EL trustees that it wished to acquire one tug and five carfloats. The trustees offered to lease those items to NYDock for 30 days at the market rate for New York harbor rentals, with an option to purchase at the amount of the highest bid the trustees might receive during the 30-day period. The offer was not accepted.
About April 1, 1976, the EL trustees began the process of liquidating those assets of the EL estate not ordered to be conveyed. They solicited and received bids on a portion of the EL floating equipment. The trustees have sought reorganization court approval to sell ten pieces of such equipment at a price of $477,000. However, as noted above, the trustees have stated that they remain willing to sell those items of floating equipment to plaintiffs or intervenors at a fair market price.
We have read and considered all the depositions, answers to interrogatories, affidavits, exhibits and briefs submitted by the parties, and have heard oral argument. We conclude that plaintiffs and intervenors have not met the burden resting upon them under § 209(e)(1) of the Act to show that USRA acted in reckless or deliberate disregard of applicable law in failing to designate the rail marine properties, facilities and equipment in the Port of New York held by the EL trustees for transfer to plaintiffs or intervenors at incentive prices or at any other price.
We also conclude, however, that it is in accord with the intention of Congress and of the FSP that the EL floating equipment in the Port of New York which plaintiff or intervenors have indicated they wish to purchase be offered at fair prices to them or to other purchasers who wish to use such equipment to continue or to resume services which were rendered in New York harbor during the years immediately prior to April 1, 1976, in preference to other purchasers who do not intend to use such *1257 items for that purpose.[1] We doubt our jurisdiction to require such action at this time, but we are confident that the EL trustees and the reorganization court, which clearly has jurisdiction, will give due consideration to the factors stated in this paragraph.
On March 16, 1976 (service date March 17, 1976), ICC entered an order in Ex Parte No. 293 (Sub.-No. 10), which it summarized as follows: "Trustees of railroads in reorganization described in section 304(a) of the Regional Rail Reorganization Act of 1973, as amended (45 U.S.C. § 744), directed to permit access to properties over which service is to be continued under rail service continuation agreements executed pursuant to section 304(c)(2) of such Act."[2]
Plaintiffs and intervenors herein seek an injunction enforcing that order "with respect to the rail marine properties, facilities and equipment held by the defendants and enjoining the defendants, temporarily and permanently, pending a further order of the Commission, from refusing to comply with the provisions of § 304(d)(3) of the Regional Rail Reorganization Act of 1973, as amended." They also ask this court to stay defendants from further proceedings before the United States District Court for the Northern District of Ohio on their pending motion for leave to sell the rail marine facilities, properties and equipment held by them as trustees of the property of EL.
Section 304(d)(3) of the Act, as amended, provides that "[t]he district courts of the United States shall have jurisdiction, upon petition by the Commission or any interested person (including a government entity), to enforce any order of the Commission issued pursuant to the exercise of its authority under this subsection, or to enjoin any designated entity or the trustees of a railroad in reorganization in the region from refusing to comply with the provisions of this subsection." Although we are authorized by § 209(b) of the Act to exercise the powers of a reorganization court in any district in judicial proceedings with respect to FSP, we have concluded that we do not have jurisdiction to enforce the order of the ICC in question. Such jurisdiction exists in any of the United States district courts in which there is venue under 28 § U.S.C. 1398(a).
Judgment will be entered in the instant case dismissing the complaint and the intervening petitions.
NOTES
[1] It is not necessary to consider at this time the extent to which this conclusion applies to property other than floating equipment.
[2] The authority for the order was stated to be Section 304(d)(3) of RRRA, as amended; 45 U.S.C. § 744(d)(3), 90 Stat. 136.