NEW YORK DOCK RAILWAY,
Plaintiff,

v.

CONSOLIDATED RAIL CORPORATION, United States Railway Association, Richard C. Bond, John H. McArthur, and Robert W. Blanchette, Trustees of the Penn Central Transportation Co. and DTB Corporation, Defendants,

New York State Department of Transportation, Intervening Plaintiff.

NEW YORK DOCK RAILWAY and
Brooklyn Eastern District
Terminal, Plaintiffs,

v.

CONSOLIDATED RAIL CORPORATION, United States Railway Association, and Richard C. Bond, John H. McArthur and Robert W. Blanchette, Trustees of the Penn Central Transportation Co., Defendants,

New York State Department of Transportation, Intervening Plaintiff.

Civ. A. Nos. 77–6, 77–7.

Special Court, Regional Railroad
Reorganization Act.

July 22, 1977.

Stuart H. Johnson, Jr., of Washington, D.C., for New York Dock Railway.

Louis H. Shereff, New York City, for Brooklyn Eastern District Terminal.

John C. McTiernan, Albany, N.Y., for New York State Department of Transportation, intervening plaintiff.

Laurence Z. Shiekman, Philadelphia, Pa. (Pepper, Hamilton & Scheetz, Philadelphia, Pa., on brief), for Conrail.

Howard M. Wilchins, Washington, D.C. (Robert L. Flanagan, Washington, D.C., on brief), for USRA.

Edwin K. Taylor, Philadelphia, Pa. (John C. Saile, Jr., Philadelphia, Pa., on brief), for Penn Central Trustees and DTB Corporation.

Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

THOMSEN, Judge:

The Final System Plan (FSP), developed by United States Railway Association (USRA) pursuant to the Regional Rail Reorganization Act of 1973 (the Act), designated to Consolidated Rail Corporation (Conrail) an option, exercisable within 30 days of this Court's conveyance order under § 303(b) of the Act, to acquire the interest of Penn Central Transportation Company (PC) in two tugboats[1] and nine carfloats theretofore used by PC in rail marine operations in New York harbor. In the present actions, which were consolidated for trial, plaintiffs New York Dock Company (Dock) and Brooklyn Eastern District Terminal Company (BEDT) seek a declaratory judgment that under the Act, as amended, and certain portions of the FSP to be discussed below, Conrail should "pass through" the PC interest in the two tugs to Dock, and the PC interest in the nine carfloats to Dock and BEDT, at "incentive prices" (see FSP, Vol. II, p. 10); plaintiffs also seek an injunction against the sale of the equipment to anyone else.

In the first of these actions, which involves the tugs, Dock is suing Conrail, USRA, the Trustees of the property of the Penn Central Transportation Company (PC Trustees), and DTB Corporation, which is a subsidiary of a PC subsidiary. DTB is the owner of the two tugs, which it leased to PC in 1960 under a demise charter for a term of 20 years, with an option to extend the term for an additional five years. In the second action, which involves the carfloats, Dock and BEDT are suing Conrail, USRA and the PC Trustees. The New York State Department of Transportation has intervened as a party plaintiff in both cases. Evidence has been presented in the form of depositions, affidavits and exhibits; briefs have been filed and oral argument heard.

Section 209(e)(2) of the Act gives this Court original and exclusive jurisdiction over all actions seeking to interpret, modify or implement any order of this Court conveying property under § 303(b) of the Act.[2] The present actions involve the interpretation and implementation of the option designated to Conrail in the FSP and the conveyance order of this Court.

On April 9, 1976, eight days after the effective date of the conveyance order and within the option period designated in the FSP, Conrail sent to PC a notice of exercise of option with respect to the two tugs and the carfloats. A dispute arising out of the refusal of the PC Trustees to recognize Conrail's right to exercise the option was resolved by a settlement agreement reached on June 18, 1976, in which the PC Trustees recognized the validity of the Conrail option and agreed to abide by any determination with respect to the disposition of the tugs and carfloats reached by Conrail after

---

1. The FSP refers to four tugs, but two of them had been sold before the FSP was published, and are not involved in this case.

2. Section 209(e)(2) provides:

"The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to section 303(b) of this Act in order to effect the purposes of this Act or the goals of the final system plan. During the pendency of any proceeding described in this paragraph, the special court may enter such orders as it determines to be appropriate, including orders enjoining, restraining, conditioning, or limiting any conveyance, transfer, or use of any asset or right which is subject to such an order or which is at issue in such a proceeding, or which involves the enforcement of any liens or encumbrances upon such assets or rights. Any orders pursuant to this paragraph which interpret, alter, amend, modify, or implement orders entered by the special court shall be final and shall not be restrained or enjoined by any court."

meeting with the PC Trustees and the plaintiffs to receive their views concerning the utilization of the floating equipment.

The settlement agreement removed one obstacle to the ultimate disposition of the floating equipment. A second obstacle— the possibility that Conrail would be subject to a deficiency judgment upon conveyance of said equipment to plaintiffs if the price received by PC were ultimately held to be not "fair and equitable" within the meaning of § 303(c)(2) of the Act—was removed by the Rail Transportation Improvement Act of 1976, which added § 303(c)(6) of the Act. The new provision extends deficiency judgment protection to Conrail and certain other transferees with respect to transfer of the floating equipment covered by the option.[3]

Following Conrail's exercise of its option, the interested parties entered into negotiations with respect to the terms under which the floating equipment would be transferred to plaintiffs. Due to the inability of the parties to agree on the price which plaintiffs should pay for the equipment, transfer of the equipment to plaintiffs was never effectuated. Plaintiffs never offered to pay more than a nominal rent or price for the tugs or a nominal price for the carfloats, and DTB and the PC Trustees were never willing to accept less than fair market value.[4] While the negotiations were continuing Conrail made the April and October 1976 rental payments on the tugs in order to preserve plaintiffs' ability ultimately to acquire PC's leasehold interest therein.[5]

During the period the parties were negotiating, the tugs were in the custody and control of Conrail at its Greenville facility on the Jersey shore. Except for a short time when one of the tugs was leased to BEDT, the equipment remained idle, and suffered substantial deterioration due to vandalism and lack of maintenance. In February 1977, after investigation revealed the deteriorated condition of the tugs, DTB gave notice to Conrail that its failure to maintain the tugs was a violation of the lease and that the lease would be terminated if the default were not remedied within 30 days. On March 29, 1977, Conrail decided that the prospects for resolution of the negotiations were dim and stopped payment on its check for the rent due on April 1. On April 12 DTB notified Conrail that the lease was terminated because of Conrail's failure to maintain the tugs. DTB thereupon took possession of the tugs.

The portions of the FSP dealing with railroad marine operations in the port of New York and their importance to the New York metropolitan area were discussed generally in *Schuler v. Patton,* 416 F.Supp. 1252, at 1254–56 (Spec.Ct.1976). USRA concluded that despite the inefficiency of carfloat operations it was necessary to continue such operations at certain New York locations. USRA recommended that "New York harbor float service be continued * * * and the floating services be provided by the independent dock carriers (Brooklyn Eastern District Terminal and

---

**3.** Section 303(c)(6) provides:

"Whenever the Corporation exercises an option to acquire, or acquires, interests in rail marine freight floating equipment pursuant to the recommendations of the final system plan, and the Corporation thereafter makes such floating equipment available to a profitable railroad operating in the region, a State, or a responsible person (including a government entity), the United States shall indemnify—

"(A) the Corporation against any costs or liabilities imposed on the Corporation as the result of any judgment entered against it, with respect to such equipment, under paragraph (2) of this subsection; and

"(B) such profitable railroad, State, or responsible person against any costs or liabilities imposed thereon as the result of any judgment

entered against such profitable railroad, State, or responsible person under paragraph (3) of this subsection;

plus interest on the amount of such judgment at such rate as is constitutionally required."

**4.** At one meeting a representative of BEDT inquired whether the PC Trustees would consider selling the tugs for $103,000 each; the PC representative indicated that the Trustees would sell for $125,000 each. BEDT never offered to buy one or both for any substantial amount, and is not now seeking to buy the tugs or either of them.

**5.** The April rental payment totaled $27,557.20 and the October rental payment $26,960.86.

the New York Dock Railway)." FSP, Vol. I, p. 11. USRA further observed that while Dock and BEDT had indicated an interest in providing carfloat services in the harbor, they had undertaken no binding commitment to provide those services. "Therefore," the FSP stated, "there is designated to ConRail an option exercisable at any time before the expiration of 30 days after the Special Court's order of conveyance under section 303(b), to acquire all or less of Penn Central's interest in certain floating equipment, identified in the appendix, and presently used at Greenville, N.J." FSP, Vol. I, p. 251. The floating equipment so designated included the two tugs and nine carfloats at issue in these cases.[6] In Chapter 9 of the FSP, USRA made specific recommendations with respect to railroad marine operations in New York harbor:

"All remaining float equipment in the area still owned by the railroads in reorganization should be made available for the rehabilitation. All floating equipment now owned by the line haul carriers would be made available to the terminal companies at incentive prices." FSP, Vol. II, p. 10.

In 1975 Congress conducted hearings to review the FSP, and neither the Senate nor the House passed a resolution rejecting it. Section 208(d), added by the RRRRA of 1976, expressly approved the FSP, as modified, amended and supplemented with respect to matters not material to this case.

It is clear from the portions of the FSP quoted above that USRA and Congress did not expect that Conrail would provide float services in New York harbor, and intended that Dock and BEDT provide such services if possible. They expected that the float equipment owned by the bankrupt carriers would be made available to Dock and BEDT at "incentive prices" and, partially to fulfill this expectation, designated to Conrail the option to purchase PC's interest in the floating equipment involved in the instant cases. The intent of Congress that the optioned equipment should be passed through to plaintiffs at incentive prices was reaffirmed by the Rail Transportation Improvement Act of 1976, extending deficiency judgment protection to Conrail and certain other transferees of the floating equipment.[7] The statement of Congressman Murphy, the sponsor of the deficiency judgment section of the 1976 Act, makes clear that the intent of that section was to facilitate the transfer of the floating equipment to plaintiffs at an incentive price by indemnifying Conrail and certain other transferees against a deficiency judgment if that price is ultimately adjudged by this Court to be too low to satisfy the "fair and equitable" standard of § 303(c)(2) and/or (3) of the Act. See 122 Cong.Rec.H. 11125 (daily ed. Sept. 27, 1976).

### Carfloats

Neither the statute nor the FSP defines "incentive price" or specifies who shall determine it and how it shall be computed. At oral argument, we were informed that bids have been received as high as $78,500 for the carfloat in the best condition and $10,000 for the one in the worst condition. The Court agrees with plaintiffs

---

6. A list of the equipment designated under the option appears in FSP, Vol. I, p. 263. See n. 1, supra.

7. The House Conference Report on that Act states:

"*House amendment*

"This amendment attempted to clarify the intent of Congress with respect to harbor marine rail equipment. The amendment restated with specificity what was the original intent of the final system plan (FSP), namely, that the Brooklyn Terminal carriers were to provide the service formerly performed by the bankrupt line haul carriers. For that purpose, the floating equipment formerly owned by the railroads in reorganization and used by them to provide this service was to be made available to provide continued service.

"The FSP specifically designated four tugs and nine car floats owned by the Penn Central for acquisition. This provision enabled ConRail to exercise the option granted it by the FSP by providing (1) immunity from liability for its officers and directors, and (2) deficiency judgment protection for the exercise of the option.

"*Conference substitute*

"The conference substitute follows the House provision." H.Rep. No. 94–1743, 94 Cong., 2d Sess. 31 (1976).

that "incentive price" means something less than the market value of the carfloats. The questions remain: who is to determine the "incentive price" and how it is to be determined. We conclude that USRA is the most appropriate body to make that determination. We therefore order USRA promptly to fix the "incentive price" at which Dock and BEDT or either of them may purchase each of the carfloats, taking into account all relevant factors, including the portions of the FSP cited above, the fair market value of the several carfloats and the ability of plaintiffs to pay for them, and to state how it arrived at its conclusion. The price set by USRA will not be subject to challenge by any of the parties except under the reckless and deliberate disregard standard of § 209(e)(1)(C) of the Act. Conrail will make the carfloats available to the plaintiffs at the incentive price, although plaintiffs are not obligated to accept any of them and can accept some or all.[8] Any agreement of sale shall contain suitable conditions to ensure continued use of the carfloats in New York harbor. If the plaintiffs purchase some or all of the carfloats, the purchase money should be passed by Conrail through to the PC Trustees. We authorize this pass through because of the particular terms of this designation and the circumstances of the exercise of this option. Our ruling is not intended to be a precedent for other situations. Both Conrail and plaintiffs will be entitled to deficiency judgment protection under § 303(c)(6) of the Act in the event the purchase is consummated.

### Tugboats

The two tugboats present a different problem. Dock argues that "incentive price", in the context of PC's lease of the tugs from DTB, means that it may lease one or both of them at a much lower rental than that fixed in the lease from DTB to PC. DTB, in addition to challenging this, takes the position that the leasehold interest subject to the option no longer exists because it validly terminated the lease after Conrail failed to maintain the tugs.

Although there was no formal assignment to Conrail of PC's leasehold interest, when Conrail exercised the option and paid the two semi-annual installments of rent due under the lease, it assumed PC's obligations under that lease, including the obligation to maintain the tugs. Conrail exercised the option in order to give Dock and BEDT an opportunity to work out an agreement with DTB and the PC Trustees for the continued lease or sale of one or both of the tugs. When neither Dock nor BEDT was willing, despite a year's discussion, to offer more than a nominal rent or purchase price,[9] Conrail was justified in not maintaining the tugs and in discontinuing the rental payments. DTB then became entitled to terminate the lease after giving Conrail notice of default and an opportunity to cure. Thus, the leasehold interest which Conrail acquired under the designated option no longer exists and cannot be passed through to Dock at any price.[10] The tugs are now owned by DTB free and clear of the leasehold interest and may be offered for sale.

We regard this turn of events as most unfortunate. It has left us unable to implement the clear intent of Congress that some sort of possessory interest in the tugs be

---

**8.** Nothing in this disposition is inconsistent with our ruling in *Schuler v. Patton, supra.* There, we refused to order the estate of a bankrupt railroad to convey property not designated for conveyance in the FSP. Here, we instruct Conrail to make property available to plaintiffs in order to implement the express provisions of a designation.

**9.** See n. 4, *supra.*

**10.** Dock argues that § 303(b)(2), which provides that all properties conveyed to Conrail

"shall be conveyed free and clear of any liens and encumbrances," operates to extinguish the obligation to pay rent under the leasehold upon the conveyance to Conrail since this case comes under none of the exclusions of that section and since § 303(b)(4), which expressly preserves the obligation to pay rent upon conveyance of certain leases, is inapplicable. We do not believe the obligation to pay rent can be characterized as a lien or encumbrance. Rather, it is part and parcel of the leasehold interest designated in the FSP and conveyed to Conrail.

conveyed to Dock or BEDT. Neither Congress nor this Court, however, can remove the most serious obstacle to agreement among the parties, the unreasonableness of the parties themselves. We should note, though, as we did in *Schuler v. Patton, supra,* that it remains the intent of the FSP and of the Congress that floating equipment used in New York harbor operations by the bankrupt carriers before April 1, 1976, should remain available for service in that area. While the extinguishment of the leasehold interest prevents us from requiring such a result, it would be in accord with the recommendations of the FSP for DTB to make the tugs available at a fair price to Dock in preference to other buyers. The New York State Department of Transportation or other public authorities may wish to assist Dock in financing such a purchase.

Finally, we conclude that under all the facts and circumstances no party to this case has any claim against any other party for any act or failure to act with respect to the tugs.