564 F.Supp. 385 (1983)
PRAIRIE CENTRAL RAILWAY COMPANY, and The Penn Central Corporation, Plaintiffs,
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, Defendant.
Civ. A. No. 82-10.
Special Court, Regional Rail Reorganization Act.
May 25, 1983.
Fritz R. Kahn, William C. Evans, Washington, D.C. (Verner, Liipfert, Bernhard & McPherson, Washington, D.C., of counsel), for plaintiff Prairie Central Ry. Co.
Carl Helmetag, Jr., Philadelphia, Pa. (Verner, Liipfert Bernhard & McPherson, Washington, D.C., of counsel), for plaintiff Penn Central Corp.
R. Eden Martin, Lawrence A. Miller, Richard D. Geiger, Washington, D.C. (Howard D. Koontz, and Sidley & Austin, Chicago, Ill., of counsel), for defendant Illinois Central Gulf R. Co.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
PER CURIAM:
This action raises questions concerning the interpretation and application of §§ 304(c) and (d) of the Rail Act.[1] At stake is roughly three miles of trackage and related facilities located between Decatur Junction and Decatur, Illinois, owned by the defendant, Illinois Central Gulf Railroad Co., and used by the co-plaintiff, Prairie Central Railway Co., under a lease agreement with the co-plaintiff, Penn Central Corp. In their complaint, Prairie Central and Penn Central ask this Court to approve *386 their continued operation of the line in dispute. We dismiss for lack of jurisdiction.
Section 201(a) of the Rail Act created the United States Railway Association (USRA), a government corporation responsible for preparing a Final System Plan (FSP) to restructure certain railroads in reorganization, including the Penn Central, into a financially self-sustaining rail service system. Under the FSP, which became effective on April 1, 1976, the portion of USRA Line No. 609 connecting Decatur and Paris, Illinois, including the three-mile segment of line between Decatur Junction and Decatur at issue in this suit, was mentioned as being available for public subsidy under § 304 of the Act. These three miles are owned by Illinois Central Gulf, with trackage rights granted to Penn Central under a 1928 joint facilities agreement, partially amended and superseded by a contract entered into between Illinois Central Gulf and the trustees of Penn Central on April 1, 1976. The modified agreement recognized the obligation of the trustees to permit Penn Central's rights between Decatur Junction and Decatur to be used by an operator designated by the Illinois Department of Transportation (IDOT), and it authorized the trustees to allow ConRail, or any other operator that the State of Illinois might designate, to use the three-mile segment in serving Line 609. The agreement provided that the trustees could not allow other railroads to use the facilities, that the contract could be terminated upon one year's notice, and that the trustees could not assign Penn Central's interest under the agreement without the written consent of Illinois Central Gulf.
Beginning in April 1976, Penn Central leased the line to IDOT, which first designated ConRail and later Wabash Valley Railroad to conduct rail freight services from Paris to Decatur. In March 1981, the State of Illinois discontinued its subsidy payments, and Wabash Valley ceased operations. One month later, Illinois Central Gulf gave Penn Central one year's notice that it would terminate the trackage rights over the last three miles of the line. Subsequently, Penn Central leased the entire line to Prairie Central, which has conducted freight services from Paris to Decatur since July 9, 1981. Penn Central did not seek Illinois Central Gulf's written consent to the assignment of the three miles of trackage rights, nor did IDOT designate Prairie Central as operator of the line. On April 22, 1982, one day after Illinois Central Gulf terminated Penn Central's trackage rights, the Interstate Commerce Commission granted Prairie Central a certificate of its status as designated operator along Line No. 609, including Penn Central's "rights over [Illinois Central Gulf] tracks" between Decatur Junction and Decatur.
In March 1982, Penn Central and Prairie Central brought this action to prevent Illinois Central Gulf from terminating Prairie Central's operation over the track and facilities between Decatur Junction and Decatur. The plaintiffs argue that the termination is contrary to the policy of §§ 304(c) and (d) to preserve service over lines not conveyed to ConRail, and they ask this Court to approve their operation of the line, to enjoin Illinois Central Gulf from interfering with the operations of Prairie Central or the trackage rights of Penn Central, and to award "such damages caused the Plaintiffs by the unlawful conduct of the defendant."
The plaintiffs contend that Prairie Central, as an offeror of a rail service continuation payment under section 304(c) and as a designated operator under section 304(d) of the Act, has the right to operate over the entirety of USRA Line No. 609 as described in the Final System Plan, including that portion of the line between Decatur Junction and Decatur owned by Illinois Central Gulf, as long as Prairie Central continues to pay subsidies to itself. Section 304 of the Rail Act governs abandonment or discontinuance of services on rail properties of reorganized railroads. These properties are defined under § 102 to include "assets or rights owned, leased, or otherwise controlled *387 by a railroad" in reorganization. Section 304(c)[2] provides that such properties may not be abandoned, and that service may not be discontinued if a "financially responsible person (including a government entity)" offers a subsidy designed to offset losses incurred in continuing the service. Section 304(d)[3] of the Act governs who may provide the services to be sustained by continuation subsidies, and when a "designated operator" may decline to participate in providing these services.
Although the question the plaintiffs ask us to examine requires an interpretation and application of a provision of the Rail Act, our reading of the provisions of the Act conferring jurisdiction convinces us that the present action is not properly before this Court. Section 209(e)(1) does not confer exclusive jurisdiction over every suit requiring an interpretation of the Act.[4] *388 The statutory language on its face is clear that there must be a challenge to Association action or inaction, or to a provision of the Act. No designation or conveyance of property under § 206(c) or USRA action or inaction authorized by the Act is involved in this case. And the plaintiffs do not challenge the Act, but are bringing suit under it. Nor do we find that the action falls within § 209(e)(2),[5] a provision which, as the legislative history reveals, applies only to "disputes concerning the meaning and implementation of [the special court's] conveyance orders". S.Rep. No. 781, 94th Cong., 2d Sess. at 187. This is not a suit "to interpret, alter, amend, modify or implement any of the orders entered by such court pursuant to section 303(b) of this Act in order to effect the purposes of this Act or the goals of the final system plan." Rather than dealing with an order entered by this Court to implement the FSP, any claims Prairie Central and Penn Central might have derive from the provisions of the Act relating to properties not designated in the FSP. As the FSP makes clear, we have entered no order with respect to USRA Line No. 609:
This portion of the Peoria Secondary Track is not designated for transfer to Consolidated Rail Corp. and is available for subsidy pursuant to section 304 of the Act.
It is recommended that this line be considered for inclusion in a fossil fuel rail bank. Public officials also have recommended that certain rail rights-of-way be used for other public purposes if rail service is discontinued.
II FSP at 71.
Reliance on § 209(b) is similarly misplaced. That provision states, in relevant part, that "[t]he special court shall have the power to order the conveyance of rail properties of railroads leased, operated, or controlled by a railroad in reorganization in the region." Although the three-mile line between Decatur Junction and Decatur was operated by Penn Central, "a railroad in reorganization in the region", we conclude that § 209(b) does not authorize this Court to issue orders for the conveyance of rail properties operated by the bankrupts when ever such orders might appear to be called for in other provisions of the Act. The intent of Congress was that we be empowered to issue orders for conveyance under the FSP. As the Senate Report states, *389 "[t]hese powers [granted by § 209(b)] enable the special court to effectuate the transfers or conveyances mandated in section 303(b)" (emphasis added). S.Rep. No. 601, 93d Cong., 1st Sess. at 29, U.S.Code Cong. & Admin.News 1973, pp. 3242, 3270.
The dispute between Penn Central and Prairie Central on the one hand, and Illinois Central Gulf on the other, does not involve or affect any of the "central functions" of this Court. As we observed in Consolidated Rail Corp. v. State of Illinois, 423 F.Supp. 941, 948 (Sp.Ct.R.R.R.A.1976): "It is not every challenge relating to the Act that Congress brought within our exclusive province but only those where the critical nature of the determination demands the consistent interpretation possible only when review is concentrated in a single court .... Congressional concern focused on providing for exclusive jurisdiction where the Special Court's central functions under the Rail Act were concerned while narrowing the exclusive jurisdiction to oust problems which could be effectively dealt with by other courts." The conclusion that we do not have jurisdiction to hear this action is supported by the fact that when § 304 was enacted in 1976, Congress adopted a special jurisdictional grant, § 304(d)(3),[6] providing that the district courts enforce it. We have held that we are not a district court within this provision. Schuler v. Patton, 416 F.Supp. 1252, 1257 (Sp.Ct.R.R.R.A. 1976).
Accordingly, judgment will be entered dismissing the complaint for want of jurisdiction.
NOTES
[1] The Regional Rail Reorganization Act of 1973, as amended.
[2] Section 304(c) provides:

(c) Continuation of rail services.No rail service may be discontinued and no rail properties may be abandoned, pursuant to this section
(1) in the case of service and properties referred to in subsections (a)(1) and (b)(1) of this section, after 2 years from the effective date of the final system plan or more than 2 years after the date on which the final rail service continuation payment is received, whichever is later; or
(2) if a financially responsible person (including a government entity) offers
(A) To provide a rail service continuation payment which is designed to cover the difference between the revenue attributable to such rail properties and the avoidable costs of providing rail service on such properties, together with a reasonable return on the value of such properties;
(B) to provide a rail service continuation payment which is payable pursuant to a lease or agreement with a State or with a local or regional transportation authority under which financial support was being provided on January 2, 1974 for the continuation of rail passenger service; or
(C) to purchase, pursuant to subsection (f) of this section, such rail properties in order to operate rail services thereon.
If a rail service continuation payment is offered, pursuant to paragraph (2)(A) of this subsection, for both freight and passenger service on the same rail properties, the owner of such properties may not be entitled to more than one payment of a reasonable return on the value of such properties.
[3] Section 304(d) states, in relevant part:

(d) Rail freight service.(1) If a rail service continuation payment is offered, pursuant to subsection (c)(2)(A) of this section, for rail freight service, the person offering such payment shall designate the operator of such service and enter into an operating agreement with such operator. The person offering such payment shall designate as the operator of such service
(A) the Corporation, if rail properties of the Corporation connect with the line of railroad involved, unless the Commission determines that such rail service continuation could be performed more efficiently and economically by another railroad;
(B) any other railroad whose rail properties connect with such line, if the Corporation's rail properties do not so connect or if the Commission makes a determination in accordance with subparagraph (A) of this paragraph; or
(C) any responsible person (including a government entity) which is willing to operate rail service over such rail properties. A designated railroad may refuse to enter into such an operating agreement only if the Commission determines, on petition by any affected party, that the agreement would substantially impair such railroad's ability to serve adequately its own patrons or to meet its outstanding common carrier obligations. The designated operator shall, pursuant to each such operating agreement (i) be obligated to operate rail freight service on such rail properties, and (ii) be entitled to receive, from the person offering such payment, the difference between the revenue attributable to such properties and the avoidable costs of providing service on such rail properties, together with a reasonable management fee, as determined by the Office.
(2) The trustees of a railroad in reorganization shall permit rail service to be continued on any rail properties with respect to which a rail service continuation payment operating agreement has been entered into under this subsection. Such trustees shall receive a reasonable return on the values of such properties, as determined in accordance with the standards developed pursuant to section 205(d)(6) of this Act.
[4] Section 209(e)(1) states:

(e) Original and exclusive jurisdiction. (1) Notwithstanding any other provision of law, any civil action
(A) for injunctive or other relief against the Association from the enforcement, operation, or execution of this Act or any provision thereof, or from any action taken by the Association pursuant to authority conferred or purportedly conferred under this Act;
(B) challenging the constitutionality of this Act or any provision thereof;
(C) challenging the legality of any action of the Association, or any failure of the Association to take any action, pursuant to authority conferred or purportedly conferred under this Act;
(D) to obtain, inspect, copy, or review any document in the possession or control of the Association that would be discoverable in litigation pursuant to section 303(c) of this Act;
(E) brought after a conveyance, pursuant to section 303(b) of this Act, to set aside or annul such conveyance or to secure in any way the reconveyance of any rail properties so conveyed; or
(F) with respect to continuing reorganization and supplemental transactions, in accordance with section 305 of this Act;
shall be within the original and exclusive jurisdiction of the special court. The special court shall not hear or determine any such action prior to the date of conveyance, pursuant to section 303(b)(1) of this Act, except as the Constitution may require. Relief shall not be granted in any action referred to in subparagraph (A), (C), or (E) unless the person seeking such relief establishes that the Association acted in reckless or deliberate disregard of applicable law.
[5] Section 209(e)(2) provides:

(2) The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify or implement any of the orders entered by such court pursuant to section 303(b) of this Act in order to effect the purposes of this Act or the goals of the final system plan. During the pendency of any proceeding described in this paragraph, the special court may enter such orders as it determines to be appropriate, including orders enjoining, restraining, conditioning, or limiting any conveyance, transfer, or use of any asset or right which is subject to such an order or which is at issue in such a proceeding, or which involves the enforcement of any liens or encumbrances upon such assets or rights. Any orders pursuant to this paragraph which interpret, alter, amend, modify, or implement orders entered by the special court shall be final and shall not be restrained or enjoined by any court.
[6] Section 304(d)(3) of the Act, as amended, provides that "[t]he district courts of the United States shall have jurisdiction, upon petition by the Commission or any interested person (including a government entity), to enforce any order of the Commission issued pursuant to the exercise of its authority under this subsection, or to enjoin any designated entity or the trustees of a railroad in reorganization in the region from refusing to comply with the provisions of the subsection."