RAILWAY LABOR EXECUTIVES'
ASSOCIATION, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

No. 855, Docket 83–4191.

United States Court of Appeals,
Second Circuit.

Argued March 12, 1984.

Decided May 21, 1984.

John O'B. Clarke, Jr., Washington, D.C.
(Kimberly A. Madigan, Washington, D.C.,
Highsaw & Mahoney, P.C., Washington,
D.C.), for petitioner.

Edward J. O'Meara, Atty. I.C.C., Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., John J. Powers, III, Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., John Broadley, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I.C.C., Washington, D.C.), for respondents.

Louis H. Shereff, Shereff Brothers, New York City, for intervenor New York Cross Harbor Ry. Terminal Corp.

Malcolm B. Choset, Brooklyn, N.Y. (Wrenn & Schmid, Brooklyn, N.Y., Walter M. King, Jr., Washington, D.C., Christine A. Pasquariello, Brooklyn, N.Y.), for intervenors-respondents New York Dock Ry. and Brooklyn Eastern Dist. Terminal.

Before FRIENDLY, TIMBERS and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

Petitioner, Railway Labor Executives' Association ("RLEA"), is an association of the chief executive officers of twenty-one national labor organizations which represent virtually all of the country's organized railroad employees. It here petitions us to review and modify orders of the Interstate Commerce Commission ("ICC" or "Commission") relating to three small terminal railroads, Brooklyn Eastern District Terminal ("BEDT"), New York Dock Railway ("NYD") and New York Cross Harbor Railroad Terminal Corporation ("NYCH"), purchaser of NYD, operating in the New York Harbor area. Petitioner's grievance is that BEDT and NYD were allowed to cease and NYCH to begin operations without the imposition of labor protective conditions.

It may be useful to begin with a few words regarding the economic background of this case, which, though not detailed in the record, was well known to the parties, to the Commission, and, in considerable degree, to the courts in this circuit and to the Special Court under the Regional Rail Reorganization Act, see, e.g., Schuler v. Patton, 416 F.Supp. 1252 (Special Ct.1976); New York Dock Ry. v. Consolidated Rail Corp., 434 F.Supp. 1245 (Special Ct.1977). The bays and rivers that have made New York a great port and have added to its scenic splendor have posed serious problems for the railroads serving it, for the States of New York and New Jersey, and for the Port of New York Authority, which was formed pursuant to interstate compact, see 42 Stat. 174 (1921), in an effort to meet them. The problem was encapsulated by the United States Railway Association, created by the Regional Rail Reorganization Act of 1973, 87 Stat. 985, when it said in proposing its Final System Plan for the bankrupt railroads of the Northeast, Vol. II, p. 10, that "New York Harbor is the only port on the Eastern seaboard where, because of lack of direct rail access, carfloat operations are required to serve docks and other locations." After World War II these carfloat operations were carried on by six trunk line railroads, the Long Island Railroad and four relatively small independent companies, viz., BEDT, NYD, Bush Terminal and Jay Street Connecting Railroad. These operations were gradually discontinued until only BEDT and NYD remained. Confronted by serious operating losses, the two surviving carriers were faced with the necessity of ceasing operation, although, as will be seen, NYD succeeded in finding a new carrier, NYCH, ready to assume its services if able to make a fresh start.

### The BEDT case

On May 2, 1983, BEDT, having earlier published a Notice of Intent to Abandon Service, pursuant to 49 C.F.R. § 1152.20, alerting all interested parties, including its employees, of the procedure they must follow if they wished to protest the abandonment and to request an investigation, filed an application pursuant to 49 U.S.C. § 10904 to abandon its entire line of railroad in Kings and Queens Counties, New York, as well as to terminate rail and marine operations within the Port of New York and its interchange with Conrail at Greenville, New Jersey. The application stated that BEDT was a subsidiary of NYD Properties, Inc., which also owned 100% of the stock of NYD. The application stated the reasons for the abandonment as includ-

ing the relocation of industry away from New York City, the disruption of the historic rate parity for the Port of New York by a lowering of rates to New Jersey destinations, and the consequent election of businesses on BEDT's line to truck goods from New Jersey rail termini or utilize trucking entirely rather than use BEDT's more expensive carfloat operation. BEDT's annual carloadings had dropped 91% in the period 1973–82. Business in the first three months of 1983 had dropped by 62% from the corresponding period in 1982 and by 88% from the corresponding period in 1981. BEDT had been unsuccessful in its efforts to improve productivity by getting the unions' agreement to change outdated and costly work rules and practices. BEDT's facilities on land required considerable modernization and rehabilitation and its marine equipment required extensive renewal, the total cost of which, it was estimated, would exceed $3 million. Operations for 1982 had resulted in a loss of $120,251. Cash and cash equivalents as of December 31, 1982, had declined to $8,636; current assets, excluding amounts due from affiliated companies, were only $381,873, as against current liabilities, excluding

amounts due to NYD Properties, Inc., and affiliated companies, of $418,933. BEDT had, in recent years, been forced to sell corporate assets to meet current obligations.

RLEA submitted a letter to the Commission stating that granting the application "may well have an adverse effect" on BEDT's employees, as well as employees of other railroads, and therefore protested approval of the application and prayed that it be denied. It requested the Commission to conduct an investigation and hold oral hearings, without indicating what either would be expected to produce. The letter further asked that if the Commission determined to approve the application, it should impose conditions for the protection of employees as set forth in *Oregon Short Line R.R.— Abandonment,* 360 I.C.C. 91 (1979), "modified as to conform to the requirements of 49 U.S.C. Sections 10903(b)(2) and 11347." [1] Exercising the discretion confided by 49 U.S.C. § 10904(c)(2), the Director of the Commission's Office of Proceedings issued an order declining to institute an investigation and stating that a decision would be issued by July 5, 1983, as required by that section. RLEA did not appeal the Di-

---

1. Section 10903(b)(2) provides that on approval of an application for a certificate of abandonment.

> the Commission shall issue to the rail carrier a certificate describing the abandonment or discontinuance approved by the Commission. Each certificate shall also contain provisions to protect the interests of employees. The provisions shall be at least as beneficial to those interests as the provisions established under section 11347 of this title and section 565(b) of title 45.

Section 11347 provides that when a rail carrier is involved in a transaction involving merger, consolidation, sale, etc., with another rail carrier as described in § 11346, the Commission "shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 565 of title 45." Also the arrangement and the order approving the transaction

> must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the

> effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period).

Section 565(b) of Title 45, the National Railroad Passenger Service Act, provides that

> protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) to such employees under existing collective-bargaining agreements or otherwise; (2) the continuation of collective-bargaining rights; (3) the protection of such individual employees against a worsening of their positions with respect to their employment; (4) assurances of priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of Title 49.

rector's decision within the 10 days provided by 49 C.F.R. §§ 1011.7(b)(1) and 1152.-25(e)(2).

On July 15, 1983, an employee review board of the Commission, acting under authority delegated in 49 U.S.C. § 10305, issued a decision granting a certificate of abandonment. The board found that "BEDT is operating at a loss and, since no new traffic source has been shown, ... no reasonable potential exists for making the line profitable." With respect to the labor protective conditions sought by RLEA and two other labor organizations, the board stated that the *Oregon Short Line* conditions "are not appropriate for an entire line abandonment unless evidence shows that the applicant railroad has a corporate affiliate which will continue carrier operations or that applicant has a corporate parent which will realize significant benefits as a result of abandonment", citing authorities that will be discussed hereafter. It found that while BEDT was affiliated with NYD, the latter was discontinuing operations pursuant to the decision discussed below, and that there was no evidence of record to show that the corporate parent, New York Dock Properties, Inc., would realize significant benefits as a result of the abandonment. Accordingly, no labor protective conditions would be imposed. Under 49 C.F.R. § 1152.25(e)(2), the board's decision was administratively final.

### The NYD and NYCH cases

The history of the NYD and NYCH cases is somewhat more complicated.

NYD published a Notice of Intent to Abandon Service on April 8, 1983, concurrently with BEDT. The abandonment was to be of all of NYD's rail and marine service. This was followed on May 2, 1983,

by an application for a certificate of abandonment. For reasons similar to those alleged by BEDT, NYD's carloadings had dropped 77% in the ten year period 1973–82. Its business for the final three months of 1983 was 36% less than in the corresponding period of 1982 and 56% less than in the corresponding period of 1981. Like BEDT, NYD alleged that it had endeavored unsuccessfully to get the agreement of labor unions to change outdated and costly work rules and practices; that its physical facilities required modernization, rehabilitation and renewal at a cost of nearly $12 million, which greatly exceeded its earning or borrowing potential; and that in recent years it had been forced to sell corporate assets to meet current obligations. It had a loss of $244,511 in 1982, with an aggregate retained deficit of $3,209,777. Its balance sheet as of December 31, 1982, showed current assets, exclusive of amounts due from NYD Properties and affiliated companies, of $877,574, as against current liabilities, exclusive of amounts due to affiliates, of $2,422,538.

RLEA submitted a letter of protest of the same tenor as the one filed in response to BEDT's abandonment petition. Once again, the Director of the Office of Proceedings determined that no investigation was necessary, and RLEA did not appeal the determination within the time provided by the Commission's rules.

At this point the history of NYD's application diverges from that of BEDT. On June 3, 1983, NYCH, a newly organized corporation, applied for a certificate under 49 U.S.C. § 10901 [2] to conduct the operations which NYD was seeking leave to abandon. Incorporated in the application was a request, under 49 U.S.C. § 10505 [3],

---

**2.** This provides:

    (a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may—

    ....

    (3) acquire or operate an extended or additional railroad line ...

    ....

only if the Commission finds that the present or future public convenience and necessity

require or permit the construction or acquisition (or both) and operation of the railroad line.

**3.** This provides:

    (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a

for exemption from provisions of the Interstate Commerce Act (the "Act") that would require a filing fee, a public hearing, authorization of the securities it proposed to issue to get into business,[4] and the filing of environmental and energy information.

On July 8, 1983, one week before the deadline fixed in § 10904(c)(2) of the Act for the Commission to rule on BEDT's and NYD's abandonment applications, RLEA petitioned the ICC to consolidate the BEDT, NYD and NYCH cases for the purpose, among others, of considering the imposition of labor protective conditions on NYCH. In a decision also rendered on July 8 and served July 15, Division 1 of the Commission dealt with the applications of NYD and NYCH. Treating NYCH's limited application for an exemption as one for a full exemption from § 10901, it granted such exemption. It went on to state that since the exemption would enable NYCH to substitute its services for NYD's, "NYD's abandonment application is no longer appropriate and will be dismissed." Taking note of a request of the Brotherhood of Locomotive Engineers that it impose the labor protective conditions contained in *New York Dock Ry.—Control—Brooklyn Eastern District Terminal,* 360 I.C.C. 60 (1979), and require NYCH to grant first preference to NYD and BEDT employees, it remarked that under 49 U.S.C. § 10505(g) it could not by exemption relieve a carrier of obligations to protect employees, but observed that the imposition of protective conditions in a proceeding under 49 U.S.C. § 10901 was discretionary and ruled that no need had been shown for their imposition. Thereafter, the Commission denied RLEA's July 8 petition on the grounds that it had not been timely filed

and that the statutory deadlines would not have permitted granting the relief sought.

*The Petition to Reopen*

On July 29, 1983, RLEA petitioned the Commission to reopen[5] the two decisions served on July 15, one granting BEDT's abandonment application and the other disposing of NYD's and NYCH's applications in the manner noted. It complained of the Commission's refusal to investigate and to impose employee protective conditions. During the pendency of the petition BEDT abandoned operations and NYCH took over the operations formerly conducted by NYD. NYCH advised the Commission that it had hired 30 former employees of NYD and BEDT and would hire 16 other former NYD employees when needed.

On August 30, the ICC denied RLEA's petition to reopen. Taking up first the BEDT abandonment, it sought to justify its continued adherence to its policy of not imposing employee protective provisions in entire line abandonments except under the unusual circumstances noted in the decision of the review board, despite the seemingly mandatory language of § 10903(b)(2), see note 1 *supra,* on grounds that we shall later discuss. It ruled also that there was "nothing in the record to indicate that [New York Dock Properties, Inc., BEDT's corporate parent] will derive any significant benefit from applicant's abandonment"; that the *pro forma* protests afforded no ground for an investigation; and that RLEA had the burden of persuading the Commission of unusual circumstances justifying the imposition of labor protective conditions and had not discharged it.

The Commission then turned to the NYD–NYCH transaction. It said that by

transaction or service when the Commission finds that the application of a provision of this subtitle—

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

4. The financing required NYCH to issue promissory notes. NYD received $1 million for its assets.

5. The regulations require that further review of decisions entered without investigation be effected through petitions to reopen instead of appeals. 49 C.F.R. § 1152.25(e)(2)(i)(A).

June 3, 1983, when NYCH filed its application under § 10901, it was "apparent that NYD did not intend to prosecute its abandonment application, having agreed to sell its assets to NYCH"; that Division 1's action in dismissing the abandonment application thus "was entirely proper"; and that such dismissal "left the Commission with no proceeding mandating the imposition of employee protective conditions." Such imposition was a matter of discretion, and the Commission found that "[i]mposition of labor protection costs in cases such as this would tend to discourage the sale of lines to new carriers to continue operations, and instead tend to encourage carriers to abandon their lines." It went on to state that, "[w]ere the abandonment application not dismissed, the rationale for not imposing employee protective conditions in [the BEDT case] would have been applied here." The Commission noted that NYCH's operation had been authorized by an exemption under § 10505 and that § 10505(g)(2) forbids it to exercise its exemption authority under that section "to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle". However, the Commission held that the proviso had not been violated since the transaction exempted was one under § 10901 and the Commission would not have exercised its discretion to impose protective conditions under that section since "[n]o evidence was presented showing that we should exercise our discretion and impose an added burden on this new carrier." After discussing certain other matters, the Commission denied the petition and affirmed the July 15 decisions. This petition to review followed.

## DISCUSSION

The basic question, presented starkly by the order granting BEDT a certificate of abandonment, is whether the Commission may lawfully adhere to its policy of generally not imposing employee protective conditions on "entire line abandonments" despite 49 U.S.C. § 10903(b)(2), quoted and explicated in note 1 *supra.*

The Commission contends that this question was decided in its favor by *Simmons v. ICC,* 697 F.2d 326 (D.C.Cir.1982). We are not convinced that it was. To be sure, Judge Tamm's comprehensive opinion states that "[e]ven under the straightforward directive of section 10903(b)(2) ... the Commission possesses wide discretion to tailor employee protective provisions to the facts and circumstances attending a particular abandonment", *id.* at 335, and says that "[i]n cases of whole line abandonments ... the Commission has usually refrained from imposing any labor protection at all," *id.* at 335–36; it also repeats the Commission's justification for this policy with apparent approval, and cites the leading cases, mostly before but one after the 1976 enactment of § 10903(b)(2), in which the commission has pursued its policy, *id.* To this extent, the opinion is decidely in the Commission's favor. Still, the precise issue before the court was the legality of the Commission's using its exemptive authority under § 10505 to allow states that were initiating service over abandoned lines to start and terminate service without labor protective provisions, and the holding was that, despite §§ 10903(b)(2) and 10505(g)(2), the Commission did not exceed its power by failing to subject this "special class of carriers with modified service obligations reflecting the novel and unusual elements of this class of service", 697 F.2d at 336, to labor protective conditions either in starting or in stopping service. The question whether the Commission may still apply its "entire line abandonment" policy to a carrier like BEDT was thus left undecided.

Federal regulation of entry into or abandonment of rail transportation began with the addition of paragraphs (18), (19) and (20) to § 1 of the Interstate Commerce Act by Transportation Act, 1920, 41 Stat. 456, 477–78. The two subjects were treated together. Nothing was said about employee protection. However, the Commission was authorized by § 1(20) to attach to the certificate, whether for entry or for exit, "such terms and conditions as in its judgment the public convenience and necessity may require." *United States v. Lowden,*

308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939), held that general language in § 5(4)(b) of the Act authorized the Commission to impose employee protective conditions in transactions between carriers, in that case a lease of one railroad to another, and *ICC v. Railway Labor Executives' Ass'n*, 315 U.S. 373, 62 S.Ct. 717, 86 L.Ed. 904 (1942), held, over opposition by the Commission, that the Commission had power to impose such conditions upon abandonments. Since that date the Commission has rather regularly imposed employee protective conditions upon abandoning carriers and, in some instances, upon non-carriers acquiring abandoned lines, *see, e.g., Oklahoma ex rel. Dep't of Highways—Abandonment*, 324 I.C.C. 666, 679 (1965), although until recently Congress did not prescribe the terms of such conditions as it did for mergers and many other intercarrier transactions when it enacted § 5(2)(f), now 49 U.S.C. § 11347, by the Transportation Act of 1940, 54 Stat. 898, 907, and § 405 of the Rail Passenger Service Act of 1970, 45 U.S.C. § 565. See the typically thorough discussion by the late Judge Waterman in *New York Dock Ry. v. United States*, 609 F.2d 83 (2 Cir.1979). Labor protective provisions were imposed upon persons seeking entry primarily when they were acquiring an existing railroad. Even in such cases the Commission would not impose such conditions where, as in *Tennessee Central Ry. Co. (Rodes, Trustee) Abandonment*, 334 I.C.C. 235, 244–46 (1969), it found that labor protective costs would jeopardize the resumption of service and subvert the broader goal of maintaining transportation.

Not long after the Supreme Court had instructed the Commission in the *Railway Labor Executives'* case, *supra*, that it had discretion to impose labor protective conditions on abandonments, the Commission declined to exercise its discretion to impose such protection when a railroad not owned by another carrier abandoned its entire line. *Chicago, Attica & Southern R.R. Receiver Abandonment*, 261 I.C.C. 646

(1946). The doctrine was more elaborately expounded in *Okmulgee Northern Ry. Co. Abandonment of Entire Line*, 320 I.C.C. 637 (1964), a decision by the full Commission with three members dissenting in part. The Commission stated, *id.* at 645–46:

> In our opinion, the imposition of protective conditions in proceedings such as these, where a carrier proposes to abandon its entire line of railroad normally is not warranted, and would not serve, in most instances, to strengthen the transportation system within the contemplation of the national transportation policy. A departure from this principle in particular cases must be supported by clear and convincing evidence. In the absence of any special circumstances dictating such a departure here, our certificate and order will not be subject to employee protective conditions.

The doctrine was later expanded to include cases where the company abandoning its entire line was owned by another carrier, *see, e.g., East Carolina Ry. Abandonment*, 324 I.C.C. 506 (1964); *Washington & Old Dominion R.R. Abandonment*, 331 I.C.C. 587 (1968), and the "special circumstances" which would lead to the imposition of conditions even in entire line abandonments were defined in the manner noted above. The rationale underlying these decisions was, as explained in *Simmons, supra*, 697 F.2d at 336, "the simple realization that there will remain no other rail services performed by the exiting carrier upon which to impose the costs of labor protection. Any other result would simply tax the creditors of the abandoning carrier to provide labor with protection" (footnotes omitted). Moreover, the practical burden of labor protection in partial abandonments is mitigated by the fact that employees losing jobs as a result of the abandonment, usually those at the bottom of the seniority list, can soon be absorbed in other operations as a result of growth, attrition or both [6], whereas no such opportunity exists when all operations are abandoned, *cf.*

---

**6.** This is particularly easy when, as often occurs, the abandoned line is small and the remaining operations are extensive.

*Northampton & Bath R.R. Co.—Abandonment,* 354 I.C.C. 784, 786 (1978).

The present provisions relating to entry into and exit from rail transportation derive from the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4R Act").

Section 401(b) of the House version of the 4R Act, H.R. 10979, 94th Cong., 2d Sess. (1975), sought to amend § 1(20) of the Interstate Commerce Act by inserting the provision:

> If the issuance of the certificate may affect interests of railroad employees, the Commission shall impose a fair and equitable arrangement for the protection of such employees containing benefits no less than those established pursuant to section 5(2)(f) of this Act and section 405(b) of the Rail Passenger Service Act.

The report of the House Committee on Interstate and Foreign Commerce, dated December 12, 1975, H.R.Rep. No. 725, 94th Cong., 1st Sess. 56, stated that the bill "assures labor protection should an abandonment adversely affect an employee's job". Noting that "[c]urrent law provides that the Commission may, at its discretion, impose such labor protective provisions as a condition for issuance of such certificates", the report stated that "[t]his provision means that any certificate which is issued in the future which may adversely affect an employee of the rail company necessitates a labor protection arrangement which will protect the employee with benefits equal to those established" in the cited sections. *Id.* at 76.[7]

On the Senate side, § 802 of its version of the 4R Act, S. 2718, 94th Cong., 1st Sess. (1975), proposed a new § 1a of the Act concerning "Discontinuance and Abandonment of Rail Service", entry being left to be dealt with under § 1(18), (19) and (20). Section 1a(4) of the bill specified that

> [e]ach such certificate which is issued by the Commission shall contain provisions for the protection of the interests of employees; such provisions shall be at least as beneficial to such interests as provisions established pursuant to section 5(2)(f) of the Interstate Commerce Act (49 U.S.C. 5(2)(f)) and pursuant to section 405 of the Rail Passenger Service Act (45 U.S.C. 565).

This language reappeared, in substantially identical form, as § 1(a)(4) of the bill reported by the conference committee and ultimately enacted in Pub.L. No. 94–210, 90 Stat. 128 (1976). The conference committee issued a report in December 1975, but the matter was remitted to the committee, apparently because there was a threat that the bill would be vetoed by President Ford. This early version of the report, *see* S.Rep. No. 585, 94th Cong., 2d Sess. (1975); H.R. Rep. No. 725, 94th Cong., 2d Sess. (1975), did not discuss labor protection in connection with abandonments. However, the version issued the following January, *see* S.Rep. No. 595, 94th Cong., 2d Sess. 218–19 (1976) U.S.Code Cong. & Admin.News 1976, pp. 14, 233, 234; H.R.Rep. No. 781, 94th Cong., 2d Sess. 218–19 (1976), shortly before enactment of the bill, contained "Joint Explanatory Statements of the Committee of Conference" signed by eleven managers on the part of the Senate and ten managers on the part of the House. These characterized the Senate bill as having

> required employee protection no less beneficial than that established under sec-

---

**7.** The language of the report is nearly identical to that of H.R.Rep. No. 1381, 93d Cong., 2d Sess. 43 (1974) (to accompany H.R. 5385).

An early indication of the ICC's position regarding the House proposal may be found in a letter addressed to Chairman Rooney of the Committee on Interstate and Foreign Commerce, dated October 17, 1975, responding to a Staff Discussion Draft of the 4R Act. The Commission stated therein that it

> presently provides for employee protection in railroad abandonments, except where the in-

volved railroad is abandoning its entire line. If a railroad abandons its entire line, it ceases to be a railroad. To require such a railroad to pay employee protection seems particularly unfair as it creates an additional restraint on the railroad's effort to go out of business. We suggest that this provision be modified so as to at least allow the Commission the discretion as to whether protective conditions should be imposed in entire line abandonments.

tion 5(2)(f) of the Interstate Commerce Act and section 405 of the Rail Passenger Service Act but without intention to change the policy and practice of the Commission in connection with certificates involving total termination of service by a railroad company;

whereas the House bill was said to have "mandated the Commission to impose a fair and equitable arrangement for the protection of employees affected by any abandonment or extension of a rail line." The managers went on to say that "[t]he conference substitute follows the Senate bill" for reasons unrelated to the issue with which we are here concerned.

The Commission stated its view of § 1a(4) and its history in *Wellsville, Addison & Gatelin Railroad Corporation— Abandonment of Entire Line*, 354 I.C.C. 744, 745–46 (1978), in which it held that § 1a(4) did not require it to alter its usual practice of not imposing protective conditions on entire line abandonments:

> The precise language of section 1a(4) of the act would appear to require imposition of employee protective conditions in all permitted abandonments. However, the legislative history of the 4R Act and prior Commission precedent is clearly to the contrary. In the Report of the Committee of Conference ..., Congress indicated that the precise language of sec-

tion 1a(4) was not intended to change the policy and practice of the Commission in connection with certificates involving total termination of service by a railroad company.

*Accord, Northampton & Bath R.R. Co.— Abandonment*, 354 I.C.C. 784, 785–86 (1978).[8]

By Pub.L. No. 95–473, 92 Stat. 1337, enacted on October 17, 1978, Congress recodified the Interstate Commerce Act as Title 49 of the U.S.Code. Former § 1a(4) was reenacted as 49 U.S.C. § 10903 ("Authorizing abandonment and discontinuance of railroad lines and rail transportation"). Section 10903(b)(2) stated that

> [o]n approval [of an application for abandonment], the Commission shall issue to the rail carrier a certificate describing the abandonment or discontinuance approved by the Commission. Each certificate shall also contain provisions to protect the interests of employees. The provisions shall be at least as beneficial to those interests as the provisions established under section 11347 of this title and section 565(b) of title 45.

As comparison makes evident, this effected no substantive change.

The last chapter in the legislative history is the Staggers Rail Act, Pub.L. No. 96–448, 94 Stat. 1895 (1980). While this did

---

**8.** The Commission said:

> After the entire line of a railroad is abandoned, no operating carrier remains to enjoy the benefits of the abandonment or pay the costs of employee protection. The Commission has generally refused to impose employee protective conditions which would, in effect, require continued operation for the benefit of employees or further consumption of a failed railroad's properties for payment of employees' benefits after operations cease. The conditions imposed by the review board, those developed in *Oregon Short Line*, [354 I.C.C. 76] are not appropriate for an entire line abandonment where the abandoning railroad has no rail carrier affiliate which [will] continue operations similar to its own. For example, normally, employees who are displaced or dismissed because of an abandonment are required to exercise seniority rights where possible to obtain another position. This being impossible where all rail service ceases, the parent would be forced to provide

the full 6 years dismissal allowance with no hope of reducing this burden by using the employee's services elsewhere.

It also elaborated the reasons that would lead it to deviate from its non-imposition policy, 354 I.C.C. at 786:

> The Commission has recognized exceptions to the policy of not imposing employee protective conditions on entire system abandonments where there is a corporate parent who will benefit from the abandonment and who can be made responsible for its costs. This may occur when the parent is a rail carrier who intends to assume all or some of the subsidiary's operations but be relieved of its deficit operations. Also, employee protective conditions are imposed on a parent, whether or not it is a carrier, if the financial benefits from disposition of the properties far exceed the sum of the parent's net investment in the subsidiary in the years following the parent's acquisition of the subsidiary stock.

(Footnotes omitted).

not affect § 10903(b)(2), it amended § 10903(b)(1) and repealed § 10903(c). The amendment of subsection (b)(1) involved the deletion of a provision that application proceedings begin upon the filing of an application under § 10903(a). The repeal of subsection (c) eliminated a provision setting the dates upon which an abandonment could take effect pursuant to a certificate, depending on whether the certificate had been issued with or without an investigation.

However, a number of other provisions in the Staggers Act did concern labor protection. Section § 213 of the Act, 94 Stat. 1912–13, was the source of the provision in 49 U.S.C. § 10505(g), mentioned above, that the ICC "may not exercise its authority [to grant exemptions] under this section ... to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle". Similar solicitude for the interests of employees can be seen in § 227, 94 Stat. 1931, which amended the Bankruptcy Code, 11 U.S.C. § 1170, to specify that

> [i]n authorizing any abandonment of a railroad line under this section, the court shall require the rail carrier to provide a fair arrangement at least as protective of the interests of employees as that established under section 11347 of title 49.

An analogous amendment to 11 U.S.C. § 1172 provided for labor protection in transfers of the debtor's lines to another operator. Title V of the Act, dealing with "Conrail Title V Labor Protection", refined the protection established under earlier law. Nothing was done, however, to overrule the Commission's decision made two years earlier in the *Wellsville* and *Northampton & Bath* cases, *supra*, that the provision concerning the imposition of labor protective conditions on abandonments did not affect the Commission's position that these normally would not be imposed on entire line abandonments, although those decisions must have been well-known

to the labor organizations which participated in the hearings in regard to the bill, to the committee staffs and perhaps to at least some of the legislators themselves.

We cannot gainsay that if we were to look only at the language of § 10903, without enlightenment from what had preceded it, what occurred during its enactment, and what happened thereafter, we would be obliged to hold that the Commission was bound to include in BEDT's certificate of abandonment labor protective conditions of the sort there described. That, however, is not the way to interpret statutes. As Justice Reed said in his outstanding opinion in *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–1064, 84 L.Ed. 1345 (1940) (footnotes omitted):

> When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination".

The Court cited and relied on that opinion in *Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 9–11, 96 S.Ct. 1938, 1942–1943, 48 L.Ed.2d 434 (1976), when it reversed a decision of the Tenth Circuit, *see* 507 F.2d 743 (1974), which had given a literal interpretation to the phrase "radioactive materials" in the definition of "pollutants" in the Federal Water Pollution Control Act, notwithstanding statements in the House report and various colloquies in both chambers of Congress to the effect that the term was not intended to include radioactive materials regulated under the Atomic Energy Act.[9]

For thirty years before 1976, when Congress enacted § 1a(4) of the 4R Act, the predecessor of § 10903, the ICC pursued a policy of normally not imposing labor protective conditions on entire line abandonments—a policy founded on the Commission's expert knowledge of the significant differences between such abandonments

---

**9.** See Professor Murphy's criticism of the decision of the court of appeals in *Old Maxims Never Die: The "Plain-Meaning Rule" and Statu-* *tory Interpretation in the "Modern" Federal Courts,* 75 Colum.L.Rev. 1299, 1308–12 (1975).

and those where a viable carrier wishes to rid itself of a losing branch. So far as we are aware, the policy had not been challenged in the courts, and could not successfully have been. There is likewise no evidence that it had been challenged in Congress. When confronted with the fact that the language in the Senate bill, which was followed in the conference bill, if read literally, would put an end to this long-standing and widely recognized policy, the managers for both houses said this was not intended. Both houses of Congress accepted the conference report and enacted the bill on that understanding. One can indeed question how many members of Congress read these words in a report of 231 pages, but one can also question how many were aware of the change which the letter of § 1a(4), one section in a 50-page statute, would have wrought.[10] The Supreme Court has indicated only recently that a statement of the managers of both houses submitted to both before enactment of the bill "would be due great weight." *National Ass'n of Greeting Card Publishers v. United States Postal Service*, 462 U.S. 810, —— n. 28, 103 S.Ct. 2717, 2731 n. 28, 77 L.Ed.2d 195, 212 n. 28 (1983). See also *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C.Cir.1981) ("Because the conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent."); *Planned Parenthood Fed'n of America v. Heckler*, 712 F.2d 650, 657 n. 36 (D.C.Cir.1983); Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L.Rev. 195, 201 & n. 49 (1983) ("Conference committee reports and statements of floor managers are considered particularly weighty.").[11]

■ Two other sets of considerations confirm the conclusion that § 10903 should not be read as requiring the ICC to depart from its policy of generally not imposing protective conditions on entire line abandonments. The first is that the Commission so understood it; see the *Wellsville* and the *Northampton & Bath* cases discussed above. As the Supreme Court has said, "the construction of a statute by those charged with its administration is entitled to great deference, particularly when that interpretation has been followed consistently over a long period of time." *United States v. Clark*, 454 U.S. 555, 565, 102 S.Ct. 805, 811, 70 L.Ed.2d 768 (1982). *See also Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The second is that, as indicated, it seems highly likely that these decisions of the

10. The case differs essentially from *C.I.R. v. Acker*, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959), where the Court refused to construe a statute as imposing an added penalty upon a taxpayer when the words of the statute did not do so, simply because the Senate report and the Conference Report indicated that Congress had so intended. If the Congress wishes to impose a tax or a penalty upon a citizen, it must act, not simply talk. Here the members of Congress most knowledgeable on the subject were saying to Congress and the President that statutory language addressed to a federal administrative agency should not be read by the agency so broadly as the letter would indicate.

It would, of course, have been preferable draftsmanship if the managers had incorporated their understanding in an amendment, but that might have been thought to be incompatible with the speedy enactment of the 4R Act which was so much desired. As said by a master of the art of statutory construction, the laws of Congress "are not to be read as though every *i* has to be dotted and every *t* crossed." *United*

*States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 548–49, 70 S.Ct. 309, 315–316, 94 L.Ed. 317 (1950) (dissenting opinion of Justice Frankfurter).

11. There is still great wisdom in the remarks made by Judge Learned Hand for this court in *SEC v. Robert Collier & Co.*, 76 F.2d 939, 941 (2 Cir.1935), rev'd, 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015 (1936):

It is of course true that members who vote upon a bill do not all know, probably very few of them know, what has taken place in committee. On the most rigid theory possibly we ought to assume that they accept the words just as the words read, without any background of amendment or other evidence as to their meaning. But courts have come to treat the facts more really; they recognize that while members deliberately express their personal position upon the general purposes of the legislation, as to the details of its articulation they accept the work of the committees; so much they delegate because legislation could not go in any other way.

Commission were known to the Congress that amended § 10903 in other respects and dealt with other aspects of railway labor protection in the Staggers Rail Act of 1980, yet took no action to reverse them.

The only remaining point in the BEDT case warranting discussion is whether the Commission should have found this to be within the exceptions to its policy, see note 8 *supra*, against imposing labor protective conditions on entire line abandonments. Although RLEA's failure to suggest any exceptional circumstance is sufficient justification for the Commission's order, we see nothing in the record that would have warranted the imposition of conditions under the Commission's standard.

The NYD case presents two additional issues. The first is RLEA's contention that the Commission's dismissal of NYD's abandonment application, which obviated consideration of the seemingly mandatory language in § 10903(b)(2), violated the rule laid down in *Smith v. Hoboken R.R. Warehouse and S.S. Connecting Co.*, 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946). The Commission's position that a certificate of abandonment is not required when a railroad contemplating abandonment sells its line to a non-carrier [12] has been sustained by the Seventh Circuit in *In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 658 F.2d 1149, 1164, 1169 (7th Cir. 1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), and by the Tenth Circuit in *Railway Labor Executives' Ass'n v. United States*, 697 F.2d 285 (1983). However, RLEA argues that these decisions did not take account of *Smith*, which, indeed, is not cited in either opinion.

In *Smith*, the trustee of Hoboken Manufacturers Railroad Co., a debtor in reorganization under § 77 of the Bankruptcy Act of 1898, was endeavoring to resist forfeiture of the debtor's lease to the lessor. The district court, 56 F.Supp. 187 (D.N.J. 1944), terminated the lease and authorized the lessor to reenter the premises and oust

the debtor and the trustee. Before this, the lessor had applied to the ICC to resume operations but the Commission had dismissed the application on the ground that no certificate was needed since the lessor's public obligations had never ceased but had merely been performed by the lessee for its benefit, so that when the latter could no longer perform the obligations the lessor was automatically required to resume them, 257 I.C.C. 739, 744 (1944). After having held that the lease was properly forfeited under its terms and § 70(b) of the Bankruptcy Act, the Court went on to consider whether the order placing the lessor in possession conformed with the Interstate Commerce Act. Referring to the prior proceedings before the ICC, Justice Douglas said that these had determined only that the lessor needed no certificate to start operations, not that the lessee or its trustee could abandon them. The Court proceeded to hold that a certificate of abandonment under § 1(18) was required "whether the lessee or the lessor is abandoning operations", and, somewhat imaginatively, that if a defaulting lessee did not apply for a certificate of abandonment the lessor had the necessary standing to do so on its behalf. 328 U.S. at 130, 66 S.Ct. at 952. After a further discussion of the Commission's responsibility to prepare a plan of reorganization under § 77 and the importance of continued operation of the debtor as lessee to the formulation of such a plan, especially on the facts in *Smith*, where forfeiture of the lease would have deprived the debtor of all its railroad properties, the Court reversed the order of the district court declaring the lease forfeited and directed it to stay its hand pending decision by the ICC on an application for abandonment.

Although the strict logic of *Smith* would seem to dictate a conclusion that the questions whether one railroad should be allowed to abandon a line and another should be allowed to operate it are distinct, the Commission has not always seen it that way. Long before *Smith* the ICC had dis-

---

12. Acquisitions by existing carriers are governed by 49 U.S.C. § 11343, *In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co., infra*, 658

F.2d at 1169. No certificate of abandonment is required, but certain employee protective conditions are mandatory under 49 U.S.C. § 11347.

missed a pending abandonment application when it approved a simultaneous acquisition by a new applicant, *see Acquisition of Chicago, Terre Haute & Southeastern Co.*, 70 I.C.C. 20 (1921), and it has sometimes followed that practice or otherwise declined to require a certificate in cases subsequent to *Smith, see, e.g., Iowa Terminal R.R. Co. Acquisition & Operation*, 312 I.C.C. 546 (1961); *Cadillac & Lake City Ry. Co.—Acquisition & Operation*, 320 I.C.C. 617 (1964); *Prairie Truck Ry.— Acquisition & Operation*, 348 I.C.C. 832 (1977), *aff'd sub nom. Illinois v. United States*, 604 F.2d 519 (7th Cir.1979). On the other hand, in some cases, *see, e.g., Okmulgee Northern Ry. Co. Abandonment*, 320 I.C.C. 637 (1964), the Commission has entertained and granted an abandonment application at the same time that it has granted an application to acquire and operate the abandoned line. Two district court decisions have said that *Smith* would require an abandonment proceeding even when the property was to continue in rail use in new hands. *See In re Boston Terminal Co.*, 71 F.Supp. 472, 474 (D.Mass.1947); *Massachusetts v. Bartlett*, 266 F.Supp. 390, 392 (D.Mass.1967). In *California v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978), the majority cited *Smith* with apparent approval, *id.* at 529 n. 6, 98 S.Ct. at 1960 n. 6, whereas the dissent suggested that it be limited to the alternative ground relating to the importance of the leased line to the contemplated reorganization of the debtor, *id.* at 542 n. 21, 98 S.Ct. at 1967 n. 21.

■ Rather than rely on the ICC's ambivalent practice or on the two recent decisions of the Seventh and Tenth Circuits, which did not discuss the possible applicability of *Smith*, we prefer to rest our decision on the Commission's statement that

even "were [NYD's] abandonment application not dismissed, the rationale for not imposing employee protective conditions in [the BEDT case] would have been applied here." The record makes clear that NYD's case for abandonment was as strong as BEDT's; large parts of the applications duplicate each other. Indeed, NYD's case for granting the application would have been enhanced by the prospect of continued operation. It is equally evident that the same reasons that led the ICC to refuse to impose labor protective conditions on BEDT would have applied in the case of NYD; indeed the Commission expressly so stated.[13] Whether this is translated into a statement that RLEA lacks standing to protest the dismissal of NYD's abandonment application or into one that it suffered no legally cognizable injury therefrom, we decline to direct a remand to entertain an abandonment application whose outcome would be foreordained. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709 (1969).

■ The other issue is RLEA's claim that the Commission abused its exemption authority under § 10505 since if the NYCH purchase had been carried out under § 10901 the ICC would have at least required NYCH to accord priority hiring rights to employees of NYD in order of seniority.[14] The Commission did not specifically discuss this in its opinion but relied rather on its general statement that it would have imposed no labor protective conditions under § 10901. Answering RLEA's contention that, under the Regional Rail Reorganization Act of 1973, the Rock Island Transition and Employee Assistance Act and the Milwaukee Railroad Restructuring Act, the employees of Conrail, the Rock Island and the Milwaukee

---

**13.** It is clear, as in the BEDT case, that RLEA has alleged nothing to show that the NYD abandonment fell within the Commission's extraordinary circumstances exception. NYD was paid only $1,000,000 by NYCH as against the parent's investment of $2,503,300 and accumulated deficits of $3,209,777.

**14.** RLEA relies on the statement in 49 U.S.C. § 10910, which is not directly applicable, that:

(e) The Commission shall require, to the maximum extent practicable, the use of the employees who would normally have performed work in connection with a railroad line subject to a sale under this section. It also relied on the provisions in the three statutes referred to in the text below, which also are inapplicable.

**704**

would have a right to priority employment over NYD employees, the Commission said that his was merely an abstract danger in light of the proximity advantage of NYD employees and that in any event the ICC was not empowered to alter preferences awarded by statute. NYCH has undertaken to give preference to NYD employees but not necessarily in order of seniority. It·represents that requiring it to observe the seniority provisions of NYD's several union contracts would make successful operation of this small and costly service impossible. The Commission's general statement that, "[u]ltimately, to be successful, NYCH must make this line profitable, and we must not complicate its task by requiring it to assume obligations for employees of a predecessor carrier," is broad enough to include the request for preferential hiring of NYD employees in accordance with seniority. The Commission was within its discretion in thinking that former NYD employees would be better off with jobs with NYCH, which many of them have obtained, than with conditions protecting seniority which NYCH would not accept.

The petition to review is denied.