**RAILWAY LABOR EXECUTIVES' ASSOCIATION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION, Respondent,**

**Northwestern Pacific Railroad Co., Intervenor-Respondent.**

No. 85–7115.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 13, 1985.

Decided March 11, 1986.

As Amended May 9, 1986.

John O'B. Clarke, Jr., Kimberly A. Madigan, Highsaw & Mahoney, P.C., Washington, D.C., for petitioner.

Robert S. Burk, Gen. Counsel, Henri F. Rush, Dep. Gen. Counsel, Richard J. Osterman, Jr., Atty., I.C.C., Charles F. Rule, Acting Asst. Atty. Gen., Catherine G. O'Sullivan, Frederic Freilicher, Atty., Dept. of Justice, Washington, D.C., for respondent.

Paul A. Cunningham, John F. DePodesta, Pepper, Hamilton & Scheetz, Washington,

D.C., Thormund A. Miller, Robert A. Bogason, Gary A. Laakso, San Francisco, Cal., for intervenor Northwestern Pacific R. Co.

Bruce A. Cohen, Sander M. Bieber, Dechert, Price & Rhoads, Washington, D.C., for amici curiae Eureka Southern R. Co., Inc. and Northwest Pacific Acquiring Corp.

Before DUNIWAY, ANDERSON and PREGERSON, Circuit Judges.

PREGERSON, Circuit Judge.

After unsuccessfully attempting to abandon the Eel River railroad line ("line"), Northwestern Pacific Railroad Company sold its interests in the line to Eureka Southern Railroad Company and Northwestern Pacific Acquiring Corporation. The Railway Labor Executives' Association ("RLEA") appeals the refusal of the Interstate Commerce Commission ("ICC") to condition its approval of the sale on either the vendor or the acquirers paying financial protections for those presently employed on the line ("labor protections").

When a railroad is abandoned, the relevant statute mandates that the ICC impose labor protections on the abandoning railroad company. However, when, as here, a non-carrier acquires a line, whether labor protections are imposed is a matter for the ICC's discretion. RLEA argues that the ICC must treat a line acquisition by a non-carrier as a two-step transaction of abandonment—thus mandating labor protections—followed by acquisition. RLEA further argues that the structure of the acquisition transaction transforms the acquirer into an existing carrier and thus subject to mandatory labor protections under another section of the statute. In the alternative, RLEA claims that the ICC should use its discretion to impose labor protections on the acquisition of the line. The would-be abandoning vendor railroad, an intervenor to the appeal, disputes whether the ICC has discretionary powers to impose labor protections. In its orders under review, the ICC treated the acquisition as a single step transaction and refused to use its discretionary powers to impose labor protections on either the vendor or the acquirer.

We uphold the ICC's statutory interpretation and its discretionary refusal to impose labor protections on the acquirers of the line. In the light of the decision of the ICC in *Ex Parte 392*, we remand the case to the ICC to permit the RLEA to petition the Commission under section 10505(d) to revoke its denial of labor protection and to permit the Commission to consider such a petition if it is filed.

## FACTS

The Eel River railroad line runs for approximately 165 miles from Outlet to Eureka in Northern California. In September, 1983, the line's owner, Northwestern Pacific Railroad Company ("NWP"), intervenor in this appeal, applied to the ICC for authority to abandon the line under 49 U.S.C. § 10903.[1] The Administrative Law Judge

1. 49 U.S.C. § 10903 states in pertinent part:

(a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may—(1) abandon any part of its railroad lines ... only if the Commission finds that the present or future public convenience or necessity require or permit the abandonment....

[ (b) ](2) On approval, the Commission shall issue to the rail carrier a certificate describing the abandonment ... approved by the Commission. *Each certificate shall also contain provisions to protect the interests of employees.*

The ICC has interpreted its statutory duty as requiring generally the imposition of the following labor protections: (1) Employees who suffer a reduction in earnings receive a displacement allowance equal to the difference between pre-transaction and post-transaction earnings for the period of their employment up to six years; (2) Employees who lose their position receive either a monthly dismissal allowance for the period of their employment up to 6 years, or a lump sum separation allowance equal to 16½ months' salary; (3) All fringe benefits continue for six years; (4) Employees are reimbursed for their moving expenses, and guaranteed payment for the fair value of their home; (5) All collective bargaining and other rights guaranteed under existing collective bargaining agreements are preserved unless altered by a new collective bargaining agreement; (6) Employees are entitled to 90 days "pre-consummation" notice, dur-

("ALJ") refused to authorize line abandonment because NWP had made an insufficient showing that the environmental damage consequent to the abandonment would be adequately mitigated. *Northwestern Pacific Railroad Company—Abandonment—in Mendocino, Trinity and Humboldt Counties, Ca.*, ICC Docket No. AB-14 (Sub-No. 4), slip op. at 45 (Feb. 3, 1984).[2]

While its appeal of the ALJ decision was pending, NWP contracted to sell the line to Northwestern Pacific Acquiring Corporation ("Acquiring") for cash and promissory notes. The sale was financed through a sale and leaseback transaction. GATX Leasing Corporation ("GATX") purchased the line's rails and ties from Acquiring, which GATX, in turn, leased for ten years to Eureka Southern Railroad Company, Inc. ("Eureka"). Acquiring then leased the real property of the line to Eureka for a similar period. Eureka will maintain and operate the line. Acquiring and Eureka were both formed expressly to purchase the Eel River Line, and both corporations are wholly owned by Mr. Bryan Whipple.

The sale contract called for Acquiring to pay NWP $3,323,500 in cash, plus a promissory note of $1,622,550. In addition, Acquiring would execute a conditional note in favor of NWP for between zero and $4,450,000 to be determined by an arbitrator's valuation of certain non-real assets purchased by Acquiring. Interest payments to NWP on the promissory note would be deferred until Eureka earned net revenue from the line of more than one million dollars in any one year. GATX paid Acquiring $3,323,500 cash for the rail and ties. Southern Pacific Transportation Company ("SPT"), of which NWP is a wholly-owned subsidiary, guaranteed GATX's investment under certain conditions.

The line sale contract between NWP and Acquiring provided that either party could terminate the transaction if the ICC conditioned approval on either labor protections or environmental obligations. The sale contract also included a general provision that the cost of any ICC-imposed conditions would be borne by Acquiring. Another provision committed Acquiring/Eureka to hire former NWP employees "[t]o the maximum extent practical," subject to certain limitations.

Acquiring and Eureka petitioned the ICC for expedited approval of the acquisition through an exemption from regulation under 49 U.S.C. § 10505.[3] On October 25,

ing which time carriers must negotiate new labor agreements and submit to binding arbitration if they fail to agree; (7) Employees are entitled to priority in rehiring. *See Oregon Short Line Railroad Co.—Abandonment—Goshen*, 360 I.C.C. 91, 93–95, 98–103 (1979) (line abandonment, 49 U.S.C. § 10903); *New York Dock Railway Co.—Control—Brooklyn Eastern District*, 360 I.C.C. 60, 84–90 (1979), *aff'd sub nom. New York Dock Railway Co. v. United States*, 609 F.2d 83 (2d Cir.1979) (acquisition under 49 U.S.C. § 11343); *Norfolk and Western—Trackage Rights*, 354 I.C.C. 605 (1978) *modified sub nom. Mendocino Coast Railway Co.—Lease and Operate*, 360 I.C.C. 653 (1980) *aff'd sub nom. Railway Labor Executives' Association v. United States*, 675 F.2d 1248 (D.C.Cir. 1982) (lease and trackage rights).

2. After the ALJ's decision, NWP discontinued service on the line. A district court issued an injunction requiring NWP to repair the line and reopen service. *See California v. Northwestern Pacific Railroad Co.*, 726 F.2d 505, 506 (9th Cir.1984) (denying request for stay pending appeal). The appeal of the district court injunction was dismissed as moot by this court on June 21, 1985 (No. 84–1600) following the ICC's dismissal of the abandonment application after completion of the sale of the line. *Northwestern Pacific Railroad Co.—Abandonment—In Mendocino, Trinity and Humboldt Counties, Ca.*, ICC Docket No. AB14 (Sub-No. 4), slip op. at 1 (May 8, 1985). Also, while NWP's appeal to the ICC was pending, the ICC found that NWP's service discontinuance was pursuant to a lawful embargo to last until the final disposition of NWP's appeal. *See California v. United States*, No. 84–7162, dismissed as moot by this court on June 21, 1985.

3. Section 213 of the Staggers Rail Act, Pub.L. No. 96–448, 94 Stat. 1895 (1980), codified as 49 U.S.C. § 10505, substantially broadened the powers of the ICC to exempt transactions from the full approval procedures normally required by statute. The ICC is now required to grant an exemption from regulation, without a proceeding, where the transaction *both* "is not necessary to carry out the transportation policy of [49 U.S.C. § 10101a]," *and* is either "of limited scope" or "not needed to protect shippers from the abuse of market power." 49 U.S.C. § 10505(a). *See generally Simmons v. ICC*, 697

1984, the ICC granted the petition. *Northwestern Pacific Acquiring Corp. and Eureka Southern Railroad—Exemption,* Finance Docket No. 30555 (Oct. 18, 1984) ("October order").[4] In January 1985, the ICC denied several petitions to reopen the exemption proceedings ("January order").[5] In its orders, the ICC held that, absent the exemption, 49 U.S.C. § 10901 alone would have governed the acquisition and thus no mandatory labor protections would be imposed. Relying on Acquiring/Eureka's new entrant status, the ICC refused to use its discretionary powers to impose labor protections on either NWP or Acquiring/Eureka under 49 U.S.C. § 10901(c)(1)(A)(ii). RLEA timely petitioned for review of the orders.

## STANDARD OF REVIEW

In reviewing an agency's construction of a statutory scheme, a court follows a two-step process. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81

L.Ed.2d 694 (1984). First, we must determine whether Congress "has directly spoken to the precise question at issue" either in the statute itself or in the legislative history. *Id.,* 104 S.Ct. at 2781. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at n. 9; *See also Chemical Manufacturers v. Natural Resources Defense Council Inc.,* — U.S. ——, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985); *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981); *Southern California Edison Co. v. FERC,* 770 F.2d 779, 782 (9th Cir.1985).

Second, if Congress has explicitly or implicitly delegated interpretative authority to the agency, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation" by the agency. *Chevron,* 104 S.Ct. at 2782; *See Chemical Manufacturers,* 105 S.Ct. at

---

F.2d 326, 333 (D.C.Cir.1982); *Illinois Commerce Commission v. ICC,* 749 F.2d 875, 877 (D.C.Cir. 1984), *cert. denied,* — U.S. ——, 106 S.Ct. 70, 88 L.Ed.2d 57 (1985).

Congress expressly circumscribed the ICC's exemption powers in one significant respect. 49 U.S.C. § 10505(g)(2) prohibits the ICC from relieving "a carrier of its obligation to protect the interests of employees. . . ." Thus, in considering Acquiring/Eureka's exemption petition, the ICC must, for the purposes of labor protection conditions only, review the application as if the normal regulatory provisions of the statute applied.

**4.** The ICC order exempts Acquiring and Eureka from 49 U.S.C. § 10901. 49 U.S.C. § 10901 requires a rail carrier to obtain ICC approval before acquiring, extending, or constructing a railroad line. Such approval will only be granted where "the present or future public convenience and necessity" require or permit such alterations in the existing railroad system. 49 U.S.C. § 10901(a). In petitions under 49 U.S.C. § 10901, the ICC is granted express discretion to require labor protections for railroad employees affected by the construction and operation of "a new railroad line." 49 U.S.C. § 10901(e). The ICC may also "require compliance with conditions" that it "finds necessary in the public interest." 49 U.S.C. § 10901(c)(1)(A)(ii). Historically, the ICC has regarded this last provision as

granting it discretion to impose labor protections where appropriate. *See infra* p. 965.

Acquisitions by non-carriers are governed by 49 U.S.C. § 10901, regardless of the vendor's status. Acquisitions by existing carriers are governed by the stricter approval provisions of 49 U.S.C. § 11343 *et seq.,* reflecting a Congressional concern for greater scrutiny of intercarrier transactions because of their potential effect on tariff competition. *Black v. ICC,* 762 F.2d 106, 115 (D.C.Cir.1985); *Illinois v. United States,* 604 F.2d 519, 526 (7th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980). Labor protections are mandatory for all transactions approved under 49 U.S.C. §§ 11343–11346. 49 U.S.C. § 11347; *see infra* section II.

The ICC's order also exempted both corporations from the requirements of 49 U.S.C. § 11301 with respect to stock issued to Mr. Whipple. This part of the order is not contested on appeal. Indeed, there is no general objection here to the propriety of the exemption procedure followed by the ICC.

**5.** The Railway Labor Executives' Association, petitioners here, was one of a number of organizations which sought to reopen the exemption proceeding. RLEA is an umbrella grouping of the chief executive officers of nineteen independent labor unions with members in the railroad and related industries. RLEA is the sole petitioner in this appeal.

1108. We will uphold an agency's decision unless it is "arbitrary, capricious or manifestly contrary to the statute." *Chevron*, 104 S.Ct. at 2782; *See also Widing Transportation, Inc. v. ICC*, 545 F.2d 652, 658–59 (9th Cir.1976). An agency's determination is arbitrary and capricious when the agency fails to consider all relevant and important factors or does not articulate a satisfactory explanation for its decision. *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

## DISCUSSION

### I.

RLEA argues that every line acquisition by a non-carrier involves a two-step process of, first, abandonment by the existing carrier and, second, acquisition by the non-carrier, thus implicating both 49 U.S.C. § 10901 and § 10903, including the mandatory labor protections of § 10903(b)(2). The ICC rejected this argument, finding that Acquiring/Eureka's purchase from NWP was covered only by 49 U.S.C. § 10901, including the discretionary labor protections of § 10901(c)(1)(A)(ii).

### A.

■ Before we reach the substantive issue, we must first resolve one procedural matter. NWP asserts that collateral estoppel precludes this court from reviewing RLEA's argument that a sale of a railroad line to a non-carrier is both an abandonment under 49 U.S.C. § 10903 and an acquisition under 49 U.S.C. § 10901. According to NWP, the Tenth Circuit's decision in *Railway Labor Executives' Association v. United States*, 697 F.2d 285 (10th Cir.1983) (per curiam) decided this very legal issue adversely to RLEA. Even assuming the strict similarity of the Tenth Circuit case to this case, NWP's argument is incorrect.

The employees whose interests RLEA seeks to protect here are not the same people whose interests it sought to protect in the Tenth Circuit case. Thus, there is no mutuality of estoppel here. Therefore, NWP is arguing that an agency may use another circuit's approval of that agency's statutory construction to estop all future petitioners seeking review of that construction in any United States Court of Appeals.

■ The courts do not require an agency of the United States to accept an adverse determination of the agency's statutory construction by any of the Circuit Courts of Appeals as binding on the agency for all similar cases throughout the United States. Thus, it would be wholly inequitable, to say the least, to permit an agency to use collateral estoppel against a petitioner in similar circumstances.

It is standard practice for an agency to litigate the same issue in more than one circuit and to seek to enforce the agency's interpretation selectively on persons subject to the agency's jurisdiction in those circuits where its interpretation has not been judicially repudiated. While the merits of this practice may be questionable in certain circumstances, *see generally* 4 K. Davis, *Administrative Law Treatise* § 21:8 (2d ed. 1983); *Starker v. United States*, 602 F.2d 1341, 1348–50 & n. 5 (9th Cir.1979), there are, in our view, persuasive and powerful reasons for rejecting the application of collateral estoppel in favor of a sensible use of the principles of *stare decisis*. *See United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 572–73, 78 L.Ed.2d 379 (1984); *American Medical International, Inc. v. Secretary of Health, Education and Welfare*, 677 F.2d 118, 121–24 (D.C.Cir.1981) (per curiam).

### B.

RLEA's statutory argument is categorical rather than specific to the situation here where an abandonment application was pending before the non-carrier acquisition. Thus, initially, we must decide whether the mandatory labor protections of 49 U.S.C. § 10903(b)(2) apply in a "pure" acquisition where a non-carrier purchases an operating line from a carrier who has indicated no intention to abandon.

By the Transportation Act of 1920, 41 Stat. 456 (1920), Congress added former section 1(18) to the Interstate Commerce Act ("Act"), 24 Stat. 379 (1887). Section 1(18) required prior ICC approval for both rail acquisitions and rail abandonments. Using its power under former section 1(20) of the Act to condition approvals, the ICC "rather regularly imposed employee protective conditions upon abandoning carriers and, in some instances, upon non-carriers acquiring abandoned lines.... Labor protective provisions were imposed upon persons seeking entry primarily when they were acquiring an existing railroad." *Railway Labor Executives' Association v. ICC,* 735 F.2d 691, 697 (2d Cir.1984). The Supreme Court specifically authorized the ICC to impose labor protections in acquisitions by carriers, *United States v. Lowden,* 308 U.S. 225, 240, 60 S.Ct. 248, 255, 84 L.Ed. 208 (1939), and, over the ICC's opposition, in abandonments as well. *ICC v. Railway Labor Executives' Association,* 315 U.S. 373, 380, 62 S.Ct. 717, 721, 86 L.Ed. 904 (1942).

In the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210 §§ 801–02, 90 Stat. 31 (1976) ("4R Act"), Congress split section 1(18) into separate provisions covering acquisitions (essentially the present 49 U.S.C. § 10901) and abandonments (the present 49 U.S.C. § 10903). The abandonment provision required the ICC to impose labor protections. 49 U.S.C. § 10903(b)(2). *See supra* note 1. The acquisition provision retained the ICC's general discretion of former section 1(20) to impose conditions on ICC approval. 49 U.S.C. § 10901(c)(1)(A)(ii). *See supra* note 4.

There is no indication whatever in either 49 U.S.C. § 10901 or § 10903 that the provisions of one section were to apply to any petition for ICC approval under the other section. Indeed, the splitting of section 1(18) suggests, if anything, the opposite. The ICC argues persuasively that the effect of RLEA's argument is to graft mandatory labor protections onto 49 U.S.C. § 10901 and to negate the distinctions be-

tween the two sections achieved by the 4R Act.

The significance of the 4R Act's distinction between abandonments and non-carrier acquisitions is emphasized by Congress' obvious concern with protecting railroad workers' interests in passing the Staggers Act in 1980. Pub.L. No. 96–448, 94 Stat. 1895 (1980). The 1980 legislation added: 49 U.S.C. § 10901(e), mandating labor protections for workers affected by newly constructed lines, *see infra* note 14; 49 U.S.C. § 10505(g), preventing the ICC from relieving a carrier of its obligation to provide labor protections in exemption approvals, *see supra* notes 3 and 4; and other provisions to protect workers affected by railroad bankruptcies, *see* 11 U.S.C. §§ 1170, 1172. The failure of Congress in the Staggers Act also to amend 49 U.S.C. § 10901 to include mandatory labor protections suggests, by negative inference, that Congress did not want labor protections to be imposed automatically in "pure" acquisitions.

Such relevant legislative history as there is supports this view. The Committee reports give no indication of Congress' reason for splitting section 1(18). *See* S.Rep. No. 94–499, 94th Cong., 2d Sess. 39–41, 105–07, *reprinted in* 1976 U.S.Code Cong. & Ad.News 14, 53–55, 121–23; S.Conf.Rep. No. 94–595, 94th Cong., 2d Sess. 218–19, *reprinted in* 1976 U.S.Code Cong. & Ad. News 148, 233–34. The 4R Act was an attempt to restructure the railroad industry in the face of chronic financial losses and line closures. *See* S.Rep. No. 94–499 at 1–4. This might explain Congress' concern to protect workers affected by abandonments. It might also suggest a congressional desire not to impose additional financial costs on a new carrier acquiring an existing line.

■ The plain words and history of the statute thus strongly suggest that "pure" acquisitions should be governed by 49 U.S.C. § 10901 alone without mandatory labor protections. This is also the ICC's view. *See Ex Parte No. 392, Application Procedures for a Certificate to Construct, Acquire or Operate Railroad Lines,* 365

I.C.C. 516, 518 (1982) ("The Commission has uniformly held that acquisition of a line of railroad by a non-carrier (including a newly formed entity organized for the purpose of providing interstate common carrier rail service) is governed by the filing requirements of 49 U.S.C. § 10901."). In any event, even if we were to conclude that congressional intent as stated in the statute and legislative history is ambiguous, we must nonetheless defer to what is a reasonable construction of the statute by the agency empowered to administer its provisions. *Chevron*, 104 S.Ct. at 2782. We, therefore, reject RLEA's argument that every line acquisition invokes the mandatory labor protections of 49 U.S.C. § 10903(b)(2).

### C.

RLEA further argues that because NWP's abandonment petition was pending when the line acquisition occurred, 49 U.S.C. § 10903 should apply here. Had the ALJ granted NWP's abandonment petition, NWP would have had to meet the mandatory labor protections of 49 U.S.C. § 10903(b)(2). Thus, RLEA argues, the ICC should have recognized substance over form, and imposed mandatory labor protections on the acquisition. *See County of Marin v. United States*, 356 U.S. 412, 415–18, 78 S.Ct. 880, 882–83, 2 L.Ed.2d 879 (1958) (structuring acquisition to avoid ICC regulation not permissible).[6]

██ · RLEA's contention runs counter to the statutory scheme as interpreted by the ICC and affirmed by the courts. According to the statute, the mandatory labor protections of 49 U.S.C. § 10903(b)(2) must be included in the ICC's certificate of abandonment. *See supra* note 1. Absent a

certificate, 49 U.S.C. § 10903(b)(2) cannot apply. Here, the ALJ had denied the certificate, and the abandonment proceeding was eventually dismissed as moot.

The ICC will generally[7] dismiss the abandonment petition on approval of the acquisition. *Acquisition of Chicago, Terre Haute and Southeastern Co.*, 70 I.C.C. 20 (1921); *Prairie Truck Railway—Acquisition and Operation*, 348 I.C.C. 832, 852 (1977), *aff'd sub nom. Illinois v. United States*, 604 F.2d 519, 524 (7th Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980); *Railway Labor Executives' Association v. ICC*, 735 F.2d 691, 695 (2d Cir.1984); *Cadillac & Lake City Railway Co.—Acquisition and Operation*, 320 I.C.C. 617, 618 (1964); *Okmulgee Northern Railway Co.—Abandonment of Entire Line*, 320 I.C.C. 637, 646 (1964). The ICC's dismissal practice is not challenged by the RLEA, and would seem to be a sensible way to avoid any hiatus in line operations due to parallel but distinct regulatory procedures. Moreover, the underlying aim of the various approval procedures is to protect the public interest in the proper running of railroads. If the acquirer has gained the ICC's imprimatur, the merits of the abandonment petition are moot because the beneficial public interest in the future operation of the line has been assured by the acquisition proceeding. *See In re Chicago, Milwaukee, St. Paul and Pacific Railroad Co.*, 658 F.2d 1149, 1169 (7th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982) ("Section 10901 applies to the new acquisition by non-carriers *regardless* of whether or not a corresponding line abandonment application has been filed by the existing operating carrier or has been denied." (emphasis in original)); *Railway Labor Executives'*

---

6. In its orders, the ICC cites two unpublished ICC opinions in support of the assertion that it has "applied *consistently*" 49 U.S.C. § 10901 alone "where the proposed transactions would result in the transfer of rail lines slated for abandonment by a carrier to a non-carrier proposing to continue rail operation." Neither opinion is on point. In both *Burlington, Cedar Rapids and Northern Railway Co.—Exemption*, Finance Docket No. 30462 (May 14, 1984), and *Minnesota Valley Transportation Co.—South-*

*west—Temporary Exemption*, Finance Docket No. 30431 (March 12, 1984), the acquirer sought approval of the purchase of an already abandoned line.

7. The ICC's practice in these matters has not been wholly consistent. *See Railway Labor Executives' Association*, 735 F.2d at 703 (ICC practice is "ambivalent").

*Association v. United States,* 697 F.2d 285, 286 (10th Cir.1983) (quoting and adopting *Milwaukee*); *cf. Simmons v. ICC,* 760 F.2d 126, 130–31 (7th Cir.1985) (acquisition under forced sale provision of 49 U.S.C. § 10905 while abandonment petition pending preempts mandatory protections of 49 U.S.C. § 10903 because abandonment petition must be dismissed). *But see Railway Labor Executives' Association v. ICC,* 735 F.2d 691, 702–03 (2d Cir.1984) (casting doubt on *Milwaukee* in light of *Smith v. Hoboken Railroad Warehouse and Steamship Connecting Co.,* 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946)).

In *Smith,* upon which RLEA relies heavily, a debtor railroad in reorganization sought to prevent the forfeiture of its rail lease. The Supreme Court held that the lessor could not resume operations until the lessee/debtor, or the lessor on the lessee's behalf, obtained ICC permission to abandon its operations. 328 U.S. at 130, 66 S.Ct. at 951.

The Second Circuit in *Railway Labor Executives' Association* noted that "the strict logic of *Smith* would seem to dictate a conclusion that the questions whether one railroad should be allowed to abandon a line and another should be allowed to operate it are distinct...." 735 F.2d at 702. The Second Circuit refused to resolve the conflict between *Smith* and *Milwaukee,* resting its opinion on other grounds. *Id.* at 703. There seems to be general agreement that *Smith* ultimately stands for no more than the general proposition that a court should normally defer to the initial authority of an agency. *See Nathanson v. NLRB,* 344 U.S. 25, 30, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952); J. Guandolo,

*Transportation Law* 112 (3d ed. 1979) ("The Supreme Court [in *Smith*] was mainly concerned over the proper adjustment of the [Interstate Commerce] Act with the Bankruptcy Act. The court recognized that the primary responsibility for reorganizing railroads in financial difficulty lies with the Commission.")

Thus, in the quite proper absence here of a certificate of abandonment, we conclude that Congress has not mandated the ICC to impose labor protections on this line acquisition.

## II.

RLEA also argues that the mandatory labor protections of 49 U.S.C. § 11347[8] are applicable to Acquiring/Eureka's acquisition of the Eel River line because Mr. Whipple's holdings trigger the "control transaction" provisions of 49 U.S.C. § 11343(a).[9] RLEA attacks the ICC's refusal to regard the acquisition as a control transaction from two directions: first, that, through an interest in an Iowa railroad, Whipple was already a carrier requiring proceedings under 49 U.S.C. § 11343(a)(3); second, that the sale and leaseback structure of the line acquisition by two entities owned by Whipple implicated either 49 U.S.C. § 11343(a)(4) or (a)(5) depending on when Acquiring and Eureka took on "carrier" status.

### A.

RLEA bases its argument that Whipple owned an Iowa carrier on a newspaper clipping from the *Santa Rosa Press Democrat* appended by Acquiring to its ICC petition. RLEA did not raise this argument below, and ICC and NWP assert

---

8. "When a rail carrier is involved in a [§ 11343 control] transaction ... the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as [the *New York Dock* terms]." 49 U.S.C. § 11347. The *New York Dock* terms are summarized in note 1 *supra.*

9. 49 U.S.C. § 11343 states in part:
   (a) The following transactions involving carriers providing transportation ... may

be carried out only with the approval and authorization of the Commission:

   ·    ·    ·    ·    ·

(3) acquisition of control of a carrier by any number of carriers;
(4) acquisition of control of at least 2 carriers by a person that is not a carrier;
(5) acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers.

that it cannot be considered on appeal. The general rule is that absent exceptional circumstances, a reviewing court will refuse to consider contentions not timely presented before the administrative proceedings. *City of Long Beach v. Department of Energy*, 754 F.2d 379, 391 (Temp. Emer.Ct.App.1985); *Getty Oil Co. v. Andrus*, 607 F.2d 253, 255–56 (9th Cir.1979). Were RLEA's claim arguably meritorious, it might be necessary to remand to the ICC to resolve this issue. However, an uncontraverted finding in an unpublished ICC opinion, of which we take judicial notice, Fed.R.Evid. 201(b)(2), contradicts the newspaper's assertion, and requires rejection of RLEA's 49 U.S.C. § 11343(a)(3) argument.

According to the ICC's opinion in *Iowa Railroad Co.—Securities Exemption*, Finance Docket No. 30105, slip op. at 1 n. 1 (Feb. 2, 1983), Whipple owned 22,000 of the 76,000 shares of common stock. An *amicus curiae* brief filed in this court on behalf of Acquiring and Eureka states that Whipple sold most of his Iowa Railroad stock on April 1, 1983, and was neither an officer nor an employee of the Iowa railroad after 1982. Whipple's present stock ownership is said to be 500 shares. The ICC has indicated a willingness to recall orders from an appeals court where a colorable control issue is raised for the first time in appellate briefs. *See Maryland Midland Group—Exemption*, Finance Docket No. 30237, slip op. at 1 (Sept. 27, 1985). The ICC has taken no such action here, presumably because it is satisfied that no genuine control problems exist here.

While it seems somewhat strange that Acquiring/Eureka would include a press clipping containing false information in its papers in support of its application to the ICC, we are satisfied, absent any reason to contradict either the ICC's opinion or the *amicus* brief, that the clipping's contents concerning Whipple's interests are incorrect. Thus, we reject RLEA's 49 U.S.C. § 11343(a)(3) argument.[10]

**B.**

The ICC also rejected RLEA's claim that the multi-part structure of the acquisition constituted a control transaction under 49 U.S.C. §§ 11343(a)(4) and (a)(5).

■ RLEA argues that, since the ICC found both Acquiring and Eureka to be "rail carriers" on consummation of the acquisition, October order at 2–3, and since Whipple owned both entities, Whipple required the ICC's approval under 49 U.S.C. § 11343(a)(4) as soon as operations began on the line.

The provisions of 49 U.S.C. § 11343(a) apply only to "carriers *providing* transportation." (emphasis added) *See* 49 U.S.C. § 10102(19) ("rail carrier" defined as "person providing railroad transportation for compensation."). When the acquisition transaction occurred neither Acquiring nor Eureka were carriers.[11] That both would become carriers by acquiring the Eel River line from NWP was the purpose of their formation, and, in itself, cannot trigger scrutiny under 49 U.S.C. § 11343. The ICC has never held that 49 U.S.C. § 11343(a) applies retrospectively, as RLEA in effect argues, and the statute gives no indication that such a reading of its intent is possible.

Alternatively, RLEA argues that the sequence of the transaction implicated 49

---

**10.** Since the evidence of Whipple's ownership interest in Iowa Railroad was submitted to the ICC by Acquiring/Eureka, it may be that the doctrine of "invited error" estops them from arguing against its use now by RLEA. *See Deland v. Old Republic Life Insurance Co.*, 758 F.2d 1331, 1336 (9th Cir.1985). Because the evidence is apparently erroneous, use of the doctrine here seems inapposite.

**11.** RLEA draws attention to a line of ICC precedent which holds that a new carrier acquiring a line is a carrier for the purposes of 49 U.S.C. § 11343. In *Alabama Southern Railroad Co. and the Alabama Great Southern Railroad Co.—Acquisitions, Operations and Trackage Rights—Exemption*, Finance Docket No. 30505, slip op. at 2 (Aug. 29, 1984), the ICC overruled this line of precedent. Since the *Alabama* decision clearly comports with a plain reading of the statutory definition of "carrier" within 49 U.S.C. § 11343, we defer to the ICC's construction of the statute.

U.S.C. § 11343(a)(5): Acquiring became a carrier on the line purchase from NWP; the sale of the track assets from Acquiring to GATX rendered GATX a carrier; and the leaseback of the tracks and line property to Eureka turned Eureka into a carrier. Even if 49 U.S.C. § 11343(a)(5) could apply by slicing a transaction into distinct commercial and chronological elements as RLEA proposes, there is no statutory violation here. Acquiring was not a "carrier providing transportation" when it purchased the line; GATX was not a carrier when it purchased the assets; and Eureka was not a carrier when it leased the tracks from GATX.

Thus, the ICC was correct to reject all of RLEA's 49 U.S.C. § 11343 claims.

### III.

Finally, RLEA argues that the ICC's refusal to use its discretion to impose labor protections under 49 U.S.C. § 10901(c)(1)(A)(ii)) [12] was arbitrary and capricious.

### A.

NWP asserts that, in amending 49 U.S.C. § 10901 in 1980 to include subsection (e),[13] Congress foreclosed the ICC's discretion to condition approval of any line transaction with labor protections except when a carrier seeks ICC approval to construct a new line. Citing the "rule" of statutory construction that specific statutory provisions override more general provisions, *see e.g., Busic v. United States*, 446 U.S. 398, 406, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980),

NWP concludes that the ICC has no discretionary power to impose labor protections under 49 U.S.C. § 10901(c)(1)(A)(ii), thus obviating the need to review the ICC's refusal to use its discretion here.

■ Generally, a reviewing court may only judge the propriety of an agency decision on the grounds invoked by the agency. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). However, the court is not so bound when, as here, the issue in dispute is the interpretation of a federal statute. *North Carolina Commission of Indian Affairs v. United States Department of Labor*, 725 F.2d 238, 240 (4th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 112, 83 L.Ed.2d 55 (1985); *Milk Transport v. ICC*, 190 F.Supp. 350, 355 (D.Minn.1960), *aff'd per curiam*, 368 U.S. 5, 82 S.Ct. 15, 7 L.Ed.2d 16 (1961).

The legislative intent is not clear from the statute's plain wording. Because 49 U.S.C. § 10901 covers both acquisitions and new construction, among other activities, Congress' decision in the Staggers Act to add 49 U.S.C. § 10901(e), but to leave § 10901(c)(1)(A)(ii) untouched from the 4R Act, indicates only a particular concern to protect workers affected by new construction. It is not reasonable to infer that this explicit expression of concern clearly meant a corresponding disapproval of the ICC's traditional discretionary powers to condition its approval of acquisitions stretching back to the *Lowden* opinion in 1939. *See supra* p. 965. Moreover, NWP can point to no relevant Congressional history to support its contention.[14]

---

**12.** 49 U.S.C. § 10901(c)(1) states:

If the Commission-(A) finds public convenience and necessity, it may ... (ii) approve the application with modifications and require compliance with conditions the Commission finds necessary in the public interest....

**13.** 49 U.S.C. § 10901(e) states:

The Commission may require any rail carrier proposing both to construct and operate a new railroad line ... to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected thereby no less protective of and

beneficial to the interests of such employees than [the standard ICC conditions].

**14.** NWP draws attention to a colloquy between Representative Florio, the floor manager of the Staggers Act, and Representative Kastenmeier. Representative Florio reassured his colleague that § 10901(e) would not impose labor protections on states who took over failing lines. "[I]t has never been the intention of the committee to apply section [10901(e)] to a rail carrier or other entity that is proposing solely to operate or acquire an existing line. Section [10901(e)] is intended to apply only to new construction or an extension of an existing line." 126 Cong.Rec. 24,862 (1980). The context and content of these

Thus, the statute is ambiguous as to whether Congress intended to grant the ICC discretionary powers to impose labor protections on either the selling or acquiring parties in new-carrier line acquisitions. Following the Supreme Court's direction in *Chevron*, we must defer to the ICC's reasonable construction of the statute it is empowered to administer. 104 S.Ct. at 2782.

■ The ICC has long interpreted 49 U.S.C. § 10901(c)(1)(A)(ii) and its predecessor provisions as granting it discretionary authority to impose labor protections in new-carrier line acquisitions. This is apparent from ICC practice: (1) under former sections 1(18) and 1(20), *see RLEA*, 735 F.2d at 697 (The ICC "rather regularly imposed employee protective conditions upon abandoning carriers, and, in some instances, upon non-carriers acquiring abandoned lines [and] ... upon persons seeking entry primarily when they were acquiring an existing railroad." (citations omitted)); (2) under the 4R Act, *see Durango and Silverton Narrow Gauge Railroad Co.— Acquisition and Operation*, 363 I.C.C. 292, 295–96 (1979), *aff'd sub nom. Railway Labor Executives' Association v. United States*, 697 F.2d 285 (10th Cir.1983) (labor protections imposed on vendor in new carrier line acquisition under 49 U.S.C. § 10901); and (3) since the Staggers Act, *see Knox and Kane Railroad Co.—Gettysburg Railroad Co.—Petition for Exemption*, 366 I.C.C. 439, 443–44 (1982) (recognizing discretionary authority to impose labor protections under 49 U.S.C. § 10901). *See also Black v. ICC*, 762 F.2d 106, 116 (D.C.Cir. 1985) ("Where the acquisition of a railway is governed by § 10901 ..., the decision whether to impose labor protective conditions ... rests within the Commission's own discretion.").

Because this is a reasonable interpretation of the statute Congress empowered the ICC to administer, we defer to the

ICC's view that 49 U.S.C. § 10901(c)(1)(A)(ii) grants it discretionary powers to impose labor protections in approving line acquisitions.

**B.**

The Supreme Court instructs us that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). However, while we must recognize the ICC's broad expert discretion, this discretion is not without limits, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962), and its exercise is not immune from a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

While we may not decide for ourselves the "correct" outcome of the agency's application of the statute, we should refuse to enforce the agency order where the order fails adequately to articulate rationally the basis for its conclusion or the reasons for choosing one outcome over another. *Atchison, Topeka and Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 805–07, 93 S.Ct. 2367, 2373–74, 37 L.Ed.2d 350 (1973) (plurality opinion); *Burlington*, 371 U.S. at 167–68, 83 S.Ct. at 245; *Trailways, Inc. v. ICC*, 673 F.2d 514, 520–24 (D.C.Cir.), *cert. denied*, 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982).

**C.**

■ In its orders here, the ICC disposed in a few short sentences of RLEA's request that the ICC use its discretion under 49 U.S.C. § 10901(c)(1)(A)(ii) *to impose la-*

remarks indicate clearly that Representative Florio was simply restating the plain wording of 49 U.S.C. § 10901(e) that its authority was limited to new construction. Representative Florio gave no hint that the new subsection was in-

tended to preempt existing ICC discretionary powers within the same section of the statute. *See Simmons v. ICC*, 697 F.2d 326, 340 (D.C.Cir. 1982) (explaining context and limited meaning of Representative Florio's remarks).

bor protections.[15] Such articulated reasoning as there is in the orders is directed entirely at absolving Acquiring/Eureka from labor protection costs. The brief conclusory statements justifying the ICC's decision not to impose labor protection costs on the acquirers are barely sufficient. Given the history of revenue losses on the line noted by the ALJ in his abandonment application opinion (more than $11 million in the two years from 1981–83), the ICC could properly consider, without further findings, that the imposition of additional long-term financial burdens on Acquiring/Eureka could seriously impair the carrier's ability to provide and maintain a regular and profitable service on the line.

Moreover, the ICC's decision here and its rationale not to impose labor protections on Acquiring/Eureka comports with the ICC's long-standing practice of refusing to impose labor protections on a new carrier acquiring a line, including acquisitions where the vendor is a would-be abandoning railroad. *See Durango,* 363 I.C.C. at 295–96; *Knox and Kane,* 366 I.C.C. at 442–44; *Alabama Southern Railroad Co. and the Alabama Great Southern Railroad Co.— Acquisitions, Operations and Trackage Rights—Exemption,* Finance Docket No. 30505, slip op. at 3 (Aug. 29, 1984) ("[T]he Commission has a long standing and judicially approved policy of not imposing labor protective obligations upon newly formed acquiring carriers.")

### D.

The ICC's orders do not discuss *at all* the propriety of imposing labor protec-

tions on NWP, the would-be abandoning vendor. Yet in both of the two relevant cases that the ICC cites in the orders to support its denial of discretion, labor protections were imposed on the vendor railroad.[16]

In the first case cited in the orders by the ICC, *Durango and Silverton Narrow Gauge Railway Co.—Acquiring and Operations,* 363 I.C.C. 292, 295–96, *aff'd sub nom. Railway Labor Executives Association v. United States,* 697 F.2d 285 (10th Cir.1983), the ICC imposed labor protections on the vendor railroad. In *Durango,* exactly as here with NWP, the ICC had denied the vendor's petition to abandon the line before the line's sale to the acquiring new carrier. Moreover, by imposing labor protections on the would-be abandoning line vendor—here NWP—the ICC in *Durango* was following its own established uniform practice. *See Prairie Trunk Railway—Acquisition and Operation,* 348 I.C.C. 832, 852 (1977), *aff'd sub nom. Illinois v. United States,* 604 F.2d 519 (7th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980) (ICC imposed labor protections on vendor railroads whose earlier abandonment petitions had been dismissed by the ICC); *Cadillac and Lake City Railway—Acquisition and Operation,* 320 I.C.C. 617, 618–19 (1962) (same); *see also Okmulgee Northern Railway Co—Abandonment,* 320 I.C.C. 637, 645–46 (1962) (4–3 majority of ICC refuses to impose conditions on vendor only because abandoning all its remaining railroad interests).

---

**15.** The full discussions of this issue in the two ICC orders was as follows:

"The imposition of labor protective conditions is discretionary in transactions under 49 U.S.C. § 10901, and, in the past, we have not imposed such conditions on newly-formed acquiring carriers. The burdens on new operators are great enough without the additional costs of labor protection." October order at 4. "Finally, the Commission has a longstanding policy of not imposing labor protective conditions on newly-formed entities that operate as carriers. The burdens on new operators are great enough without the additional cost of labor protection. No reason appears to devi-

ate from that policy in this proceeding." January order at 6–7 (citations omitted).

**16.** The ICC orders cite a third case, *Simmons v. ICC,* 697 F.2d 326 (D.C.Cir.1982), which is inapposite. *Simmons* upheld the authority of the ICC under the Staggers Act to exempt states from the labor protection provisions of 49 U.S.C. § 10505(g) when acquiring or abandoning lines. At the page cited by the ICC, the D.C. Circuit stated: "Nothing in the Commission's new rules threatens to change the protection provided labor in the usual abandonment case." *Id.* at 336.

The second case cited in the ICC orders, *In re Chicago, Milwaukee, St. Paul and Pacific Railroad Co.*, 658 F.2d 1149 (7th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), has little relevance. First, the Seventh Circuit was reviewing the decision of a statutorily-created special reorganization court, not of the ICC. Secondly, in the court's words, the case concerned an "anything but normal" situation. *Id.* at 1152. In *Milwaukee*, the appellate court affirmed the imposition of labor protections on the estate of the bankrupt Milwaukee railroad, the abandoning vendor, but not upon non-carriers acquiring Milwaukee lines. *Id.* at 1166–71.

In its briefs to this court, the ICC supplements the opinions upon which it relies for support in the orders with four recent ICC decisions in which protections were imposed on neither the vendor nor the acquirer. *Knox and Kane; Gulf and Mississippi Railroad Corp.—Purchase (Portion)—Exemption—Illinois Central Gulf Railroad Co.*, Finance Docket No. 30439 (Jan. 2, 1985); *Batten Kill Railroad Co.—Petition for Exemption*, Finance Docket No. 29918 (May 7, 1982); *Brandywine Valley Railroad Co.—Petition for Exemption*, Finance Docket No. 29748 (Dec. 2, 1981). None of these four additional ICC decisions is directly relevant because none concerns a would-be abandoning vendor railroad. The cases are relevant, however, in that they show that it is not standard ICC practice to deny the imposition of labor protections on a vendor railroad out of hand, as the silence of the ICC orders here perhaps implied.

In *Knox and Kane*, for example, the only published opinion among the four supplementary decisions, the ICC denied a union's petition to revoke an ICC exemption order that had failed to impose labor protections on the vendor railroad. In denying the petition, the ICC weighed the extent to which imposing conditions "would appear to be consistent with certain objectives of the rail transportation policy but may thwart others." *Id.* at 443. The ICC considered: the tendency of labor protections "to encourage fair wages and safe and suitable working conditions"; the financial burden that imposing labor protections would place on the vendor railroad; and the probability that imposing conditions would negate the sale, forcing the vendor to retain the railroad and cause the line's condition to deteriorate further. *Id.* at 443–44. Further, the ICC emphasized the union's year-long delay in contesting the exemption, so that to grant the petition would unfairly impose retroactive conditions on a consummated transaction. *Id.* at 444. It concluded that "although the imposition of the [standard ICC labor protections] on a vendor may at times be justified, there are countervailing considerations which dictate that this policy not be reflexively applied, and [the union] has not shown the conditions are necessary here." Id.

The ICC's recognition in *Knox and Kane* that the decision on whether to impose labor protections on a vendor is to be made by the ICC on a case-by-case basis after close scrutiny of the particular factors and weighing of the equities is also reflected in the most recent of the additional unpublished ICC opinions cited in the ICC's brief. In *Gulf & Mississippi Railroad Corp.—Purchase (Portion) Exemption—Illinois Central Gulf Railroad Co.*, Finance Docket No. 30439 (Jan. 2, 1985), the ICC, in denying the RLEA's petition for labor protections, concluded: "[A]lthough the labor representatives made certain general allegations of potential harm to affected employees, they did not attempt to quantify this harm. On the other hand, ICG [vendor railroad] furnished an adequate estimate of the burdensome effect upon it if labor conditions were imposed. ICG also submitted a comparison of labor protection costs measured against the purchase price of the lines it will sell. Clearly, the equities do not weigh in favor of imposing labor protective conditions as a discretionary matter." Slip op. at 5–6.

None of the carefully articulated, reasoned balancing of factors pertinent to the particular acquisition or reference to special circumstances employed by the ICC in

*Knox and Kane* and *Gulf & Mississippi* appears in the ICC's orders here. The ICC here had before it an uncontradicted and detailed affidavit which provided the basis for calculating the costs to NWP of imposing conditions. It also had access to the financial status of NWP, and knew the gain to NWP from the sale by the terms of the acquisition agreement. Equally, the ICC had the information to assess the beneficial impact both on former NWP workers and rail employment generally from imposing protections. The ICC could also have taken account of NWP's possible windfall gain from the sale of the line without labor protections over abandonment of the line. The ICC could have weighed these factors against any demonstrable deterrent effect on the consummation of the acquisition transaction from imposing conditions on the vendor, and the benefits of the sale with and without conditions to the development of national rail transportation policy, such as the promotion of efficient short-line rail carriers.

The ICC's failure to address any of these important issues renders the ICC's decisions in these orders arbitrary and capricious.

### E.

One month after oral argument in this case, and more than one year after the first of the ICC orders under review here, the ICC announced that, from then on, "no conditions will be imposed as a matter of course on the seller in a proposal under [49 U.S.C. § 10901]." *Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. § 10901,* Ex Parte No. 392 (Sub-No. 1), slip op. at 7 (December 19, 1985) (*"Ex Parte 392 "*).

In *Ex Parte 392,* the ICC used its rulemaking powers to exempt from regulation under 49 U.S.C. § 10505, *see supra* note 3, all petitions for changes of line use and ownership controlled by 49 U.S.C. § 10901, *see supra* note 4. In its discussion of its new rules, the ICC also concluded that it would exercise its discretion and not im-

pose employee protective conditions on this class of transactions. Slip op. at 6–7.

The ICC justified its intention generally to refuse to impose protections on the vendor railroad on the "need to encourage continuation of rail service," slip op. at 6, as exemplified by the economic reasoning and conclusions of *Knox and Kane. Id.* at 7 & n. 12. It argued that protections imposed on the vendor would be passed on to the acquirer through an enhanced line purchase price. *Id.* at 7. As a result, "the economic justification for transfer of the line is diminished if not negated." *Id.* The ICC also recognized, however, that it might still impose protections on a vendor railroad in "an extraordinary case." *Id.* In such a situation, the ICC would consider a union petition under 49 U.S.C. § 10505(d) to revoke the ICC's earlier *pro forma* refusal to impose protections on the vendor "[i]f an exceptional showing of circumstances justifying the imposition of labor protection is made." *Id.*

We conclude that we should remand to the ICC to allow it to exercise its discretion on the question of imposing labor protections on NWP. If the ICC chooses to rely on *Ex Parte 392* to issue a refusal to impose labor protections, RLEA shall have the opportunity to use the revocation procedure suggested in *Ex Parte 392* to attempt to make "an exceptional showing of circumstances justifying the imposition of labor protection" on the vendor.

### F.

In their briefs to this court, and again in oral argument, ICC's counsel argued that imposing labor protection conditions on the sale of the line will "kill the deal." ICC counsel point to two provisions in the purchase agreement. One provision permits Acquiring/Eureka to cancel the sale if labor protection costs are imposed on the acquirers; the other provision transfers to Acquiring/Eureka the cost of any obligations imposed on NWP by the ICC as a condition for its approval of the acquisition. ICC's counsel assert that, since the ICC was aware of the terms of the sale con-

tract, the ICC could, implicitly, have concluded that imposing protections on NWP would have aborted the sale and the potential revival of service on the line under new owners.

This argument is nowhere raised in the ICC's orders approving the acquisition. As a reviewing court, we must judge the propriety of the agency decision only on the grounds invoked by the agency. *American Textile Manufacturers Institute v. Donovan,* 452 U.S. 490, 539, 101 S.Ct. 2478, 2505, 69 L.Ed.2d 185 (1981); *FPC v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974) ("[An] agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself'"); *Burlington Truck Lines,* 371 U.S. at 168–69, 83 S.Ct. at 246; *SEC v. Chenery,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *Cardoza-Fonseca v. INS,* 767 F.2d 1448, 1454–55 (9th Cir.1985). It would be improper for us to accept as sufficient justification for the ICC's decision not to impose labor protections on NWP a reason that is not even hinted at in the ICC orders that we are reviewing.

Our role as a reviewing court is limited to enforcing or denying enforcement of an agency order by examining the reasoning for the conclusion articulated by the agency. When the agency fails completely to offer any justification for its decision, we would be overstepping our authority were we to rummage around in the record below to find a plausible rationale to fill the void in the agency order under review. Congress has given primary responsibility for enforcing the statute to the ICC, not to this court. Just as the Supreme Court has forbidden us to review the ICC's orders on the basis of a *de novo* examination of the evidence and our own view of the statute, we

are similarly constrained from accepting on blind faith an *ex post facto* assertion by ICC counsel that there is something in the record that had never been mentioned in the ICC's orders that somehow supports the ICC's conclusion. A reviewing court's deference to an agency decision does not stretch that far.

The problems of judicial review inherent in the approach that the ICC urges on us are apparent here. ICC counsel assert that the cancellation and transfer-of-costs terms of the line sale contract provide a sufficient basis to deny the imposition of labor protections on NWP. RLEA retorts that, if we are to speculate, from a review of the sale contract's *terms,* whether Acquiring/Eureka's acquisition of the line will be aborted if labor protections are imposed on NWP, we should also look at what motivated NWP and Acquiring/Eureka originally to agree on such terms. Since there is no mention in the ICC's orders of the sale contract or its provisions, to do as ICC's counsel requests—i.e. to find that the imposition of labor protections would effectively abort the sale because of the cancellation and transfer-of costs provisions—would impermissibly involve us, as a reviewing court, in a fact-finding expedition. In the same vein, RLEA asks us to speculate that the cancellation and transfer-of-costs provisions in the contract could be "the result of superb negotiations by the NWP (and/or Southern Pacific Transportation Company, its parent)," or the provisions were intended by NWP and Acquiring/Eureka "to be used as added fuel for Acquiring's and Eureka's arguments that they could not afford such obligations and commence operations." [17] Alternatively, one might equally speculate that the contract was deliberately worded to induce the ICC not to impose labor protections on NWP for fear of losing the continued service on the line

---

**17.** This latter "accusation" is given additional plausibility by the agreement of the ICC's counsel at oral argument to a characterization of the "net effect" of the contract's terms as a "sort of union busting operation." Given the assertions of NWP and ICC that the high costs of union labor agreements countributed significantly to NWP's substantial losses on the line, such a motivation may be understandable. However, since Congress' aims in allowing for labor protections in line acquisitions and abandonments was to ensure that workers' interests are recognized, this motivation may be a questionable basis, if true, for the ICC to justify its refusal to impose labor protections on a would-be abandoning vendor railroad.

that, apparently, only Acquiring/Eureka could provide.

Attempting to determine the falsity or veracity of these, or other more innocent, but equally relevant, reasons for the contract's ultimate choice of language would involve us in difficult issues of weighing evidence and of deciding the credibility of conflicting testimony. This fact-finding function is not the job of the reviewing court; it is a job that Congress has given to the agency alone. The impropriety of requiring a reviewing court to reach such factual conclusions without the benefit of the agency's views requires us to reject ICC's counsel's urging that we go beyond the orders themselves into the underlying record.[18]

Our review is limited to an examination of the stated reasons for the agency's conclusions to ensure that they are supported by substantial evidence in the record. If the agency offers no reasons for its conclusions, as is the case here, the reviewing court is hamstrung. In the absence here of *any* stated rationale by the ICC for its decision not to impose labor protections on NWP, the would-be abandoning vendor, in accordance with its established practice in apparently closely analogous situations, we must remand the order to the ICC.

## CONCLUSION

In our limited role as a reviewing court, we defer to the ICC's interpretation of the statute and uphold the ICC's rejection of RLEA's arguments that the ICC was statutorily mandated to impose labor protections on Acquiring/Eureka's acquisition of the line.

Similarly, we uphold the ICC's refusal to exercise its statutory discretion to impose labor protections on the line purchasers, Acquiring/Eureka. The ICC's justification for this decision—that the financial burden of labor protections will seriously endanger the acquirers' ability to offer long-term regular service on the line—is rational, is supported by previous ICC practice sanctioned by the courts, and is not arbitrary, capricious or manifestly contrary to the statute.

We cannot enforce the ICC's orders, however, because of their total failure to articulate any reason for refusing to impose labor protections on NWP, the would-be abandoning vendor railroad, in accordance with ICC practice in similar cases. This failure by the ICC makes it impossible for us as a reviewing court to understand why the ICC chose to deny rather than impose protections on NWP, and renders that part of the orders arbitrary and capricious. We thus remand the matter to the ICC for further consideration after receipt of a petition to revoke from the RLEA consistent with the ICC's procedure in these matters set out in *Ex Parte 392.*

AFFIRMED IN PART and REMANDED IN PART to the ICC.

---

**18.** We note, however, that it would be unfortunate if two private parties could contract away the statutory ability of a federal agency to assist innocent third parties who may suffer if, as here, the agency approves changes in regulated commerce requested by the contracting parties.